### GOODWIN FILM & CAMERA CO. v. EASTMAN KODAK CO.

#### (District Court, W. D. New York. August 14, 1913.)

1. PATENTS (§ 328*)—PHOTOGRAPHIC PELLICLE—FILM SUPPORT.

Hannibal Goodwin patent, No. 610,861, for a film support for photographic purposes especially in connection with roller cameras *held* valid, not anticipated, and infringed as to claims 1, 6, 8, 10, and 12, covering the process and product of the patent.

2. PATENTS (§ 168*)—INTERPRETATION—PROCEEDINGS IN PATENT OFFICE.

The interpretation to be placed on a patent is to be determined by the language of the grant, and the proceedings of the Patent Office are immaterial unless the patentee by his acquiescence has accepted limitations imposed by the rejection of broader claims.

[Ed. Note.—For other cases, see Patents, Cent. Dig. §§ 243½, 244; Dec. Dig. § 168.*]

3. PATENTS (§ 72*)—ANTICIPATING PATENTS.

Anticipating patents and publications in order to effect a patent in question must disclose the invention without patentable change or alteration.

[Ed. Note.—For other cases, see Patents, Cent. Dig. §§ 86–91; Dec. Dig. § 72.*]

4. PATENTS (§ 30*)—PATENTABLE INVENTION—PERFECTION OF ART.

The patent law does not require that an inventor shall have succeeded in bringing his art to the highest degree of perfection, but it is enough if the skilled in the art understand the process described and the specifications point out a practical way of performing it.

[Ed. Note.—For other cases, see Patents, Cent. Dig. § 34; Dec. Dig. § 30.*]

5. PATENTS (§ 283*)—PRIORITY—PROCESS PATENT—ESTOPPEL.

A patentee, during the course of proceedings to obtain a patent, practically conceded priority of a specific process for making the same article, and his successor in title is estopped thereafter to assert infringement by articles made in pursuance of the specific process patented formula.

[Ed. Note.—For other cases, see Patents, Cent. Dig. §§ 448–450, 452; Dec. Dig. § 283.*]

In Equity. Bill by the Goodwin Film & Camera Company against the Eastman Kodak Company. Decree for complainant.

Edward C. Davidson, of New York City (Edmund Wetmore, of New York City, of counsel), for complainant.

M. B. Philipp and J. J. Kennedy, both of New York City, for defendant.

HAZEL, District Judge. The Hannibal Goodwin patent in suit, No. 610,861, for photographic pellicle and process of producing same, now owned by the complainant company, was originally applied for on the 2d day of May, 1887, and was granted September 13, 1898, more than 11 years later. The bill alleging infringement by the Eastman Kodak Company of 11 out of a total of 12 claims was filed in December, 1902, and argued and submitted for decision in May, 1913. The answer of the defendant sets up various defenses, denies infringement of the patent and complainant's title thereto, and asserts the invalidity thereof in view of the state of the art and because it was granted for a different invention than that described in the application originally filed. The various questions presented and argued are of much importance and complexity; the record is voluminous and the testimony highly technical. Although the determination of the controversy is in favor of the validity of the patent and accords to the claims a liberal construction, yet such determination was reached upon a record of so contradictory a character that there remained a doubt as to the correctness of the conclusion, which doubt, however, has been resolved in favor of the patent. There was much caustic criticism of the testimony of Dr. Chandler, who testified for the complainant, and similar criticism of Prof. Main, who testified for the defendant; but the qualifications and competency of these well-known scientists to testify upon subjects relating to mechanics and the art of modern photography in its relation to films and film supports are beyond serious question or dispute. No doubt many of the wide divergences of opinion arose from the abstruseness of the subject and the almost undefinable mysteries of chemical reaction which obscure the untrained mind and which probably in a lesser degree similarly affect the minds of the skilled chemist learned in the art.

There are a number of preliminary matters, such as the denial of complainant's title, laches in the issuance of the patent, asserted laches in bringing the suit to a hearing, and an alleged champertous arrangement, which have been considered, but the assertions are believed to be insufficiently substantiated to justify the dismissal of the bill on those grounds. I therefore proceed to examine the patent upon which complainant's legal rights are based.

[1] The specification states that the object of the invention "is primarily to provide a transparent sensitive pellicle better adapted to photographic purposes, especially in connection with roller cameras." Then, after referring to the prior art and the inefficiencies of the stripping paper films, the specification says that the patentee's support for the film is nitrocellulose, and that by the simultaneous use of two classes of solvents the film support is improved and rendered insoluble in the usual fixing and intensifying solutions used in photography. The specification continues:

"In carrying out the invention I provide a suitable surface, such as that of glass, and flow over the same a solution of nitrocellulose (by which I do not mean a solution of the compound known as 'commercial celluloid' dissolved in alcohol or ether) dissolved in nitrobenzole or other nonhydrous and nonhygroscopic solvents, such as may be employed in producing celluloid, as distinguished from collodion and diluted in alcohol or other hydrous and hygroscopic diluent. The equivalents for nitrobenzole are those nonhydrous, nonhygroscopic fluid solvents of nitrocellulose which are nonmiscible with water, of slow volatility, and nongreasy, including nitrobenzole, above named, acetate of amyl, etc., which effect, when the solution has been flowed over a smooth plate, a smooth, transparent, imporous, impermeable film capable of being subjected to the photographic fluids above mentioned without being affected thereby. The solution obtained by dissolving the nitrocellulose in said nonhydrous, nonhygroscopic solvent is diluted with alcohol or other diluent, which, like alcohol, serves to dilute or expand the volume of the dissolved nitrocellulose and increase its fluidity and which may be, and ordinarily is, hygroscopic, miscible with water, and highly volatile. This diluted solution is then applied to a smooth and hard surface, from which it may be stripped when dry."

Thus it will be noticed that in practicing his process the patentee used as a solvent nitrobenzole, which he describes as a high-boiling, nonhydrous, and nonhygroscopic solvent, with the basic ingredient nitrocellulose, and as a diluent alcohol "or other diluent." The resultant of the process was a thin solution of nitrocellulose flowed evenly on a glass support and was easily removable therefrom. It is shown that, because of the high volatility of certain elements contained in the solvents, they evaporated rapidly, leaving the pellicle fluidous until the high-boiling elements which evaporate more slowly were also evaporated, when it became hard, transparent, and nonporous and, being without oil or greasiness, resisted the injurious effects of the photographic emulsion. The desired result was achieved principally through the high-boiling quality of the solvents and their nonhydrous and nonhygroscopic character. Dr. Chandler, testifying to the effects of the two classes of solvents, says:

"The sequence of evaporation from such a mixture of liquid solvents would be the following: The low-boiling rapidly evaporating diluent would pass off first; any water present which did not pass off with the vapor of the diluent would pass off next; and finally the high-boiling, nonhydrous, and nonhygroscopic solvent, such as nitrobenzole or amyl acetate, would pass off, leaving upon the support (that is, the glass plate) the nitrocellulose film in its complete and finished state ready, either before or after it is detached from the glass plate, to receive its sensitive photographic coating."

It will suffice to reproduce the following claims:

"(1) An improvement in the art of making transparent, flexible, photographic-film pellicles, the same consisting in dissolving nitrocellulose in a menstrum containing a hygroscopic element and an element which is nonhygroscopic; the nonhygroscopic element being of itself a solvent of nitrocellulose and of slower volatility than the hygroscopic element, depositing and spreading such solution upon a supporting surface, and allowing it to set and dry and harden by evaporation, and spreading a photographically-sensitive solution on the hardened film, substantially as set forth."

"(6) An improvement in the art of making transparent, flexible, and elastic photographic pellicles; the same consisting in dissolving nitrocellulose in an eventual celluloidal menstrum which is anhydrous and nonhygroscopic, spreading such solution upon a supporting surface, allowing it to dry and

harden, spreading photographically-sensitive matter thereon, and again drying and stripping the pellicle from said support, substantially as set forth."

"(8) The process of making photographic pellicles, which consists in subjecting nitrocellulose to the action of a menstrum combining fast and slow evaporating solvents; the slow evaporating solvent being nonhygroscopic and nongreasy in nature and quality and acting as an eventual solvent as described, spreading the solution upon a support and setting the same by evaporation, then applying photographically-sensitive matter and stripping, all substantially as set forth."

"(10) As a new article of manufacture, a transparent film support for photographic purposes, the same consisting of a thin, nongreasy film, foil, or pellicle of a dried and hardened celluloidal solution of nitrocellulose, combining, in addition to the following essential properties of glass-plate supports, viz., insolubility in developing fluids, insensibility to heat and moisture, imporosity of structure, and hardness, smoothness, and brilliancy of surface, the further desirable properties of exceeding thinness, lightness in weight, toughness in texture, and elasticity in flexure, as and for the purposes specified."

"(12) The process of manufacturing photographically-sensitive pellicles, consisting of flowing a nonphotographically-sensitive solution of nitrocellulose dissolved in a nonhygroscopic liquid, or a liquid which is eventually nonhygroscopic, and drying and hardening such compound into a support for the photographically-sensitive emulsion and imposing on such support the said sensitive emulsion, substantially as set forth."

There was considerable argument in the Patent Office, after Goodwin's application for patent was filed, in an effort to persuade the Primary Examiner that patent for process and product should be granted. The file wrapper and contents disclose a wealth of discursive correspondence and the institution of several interference proceedings to which reference is hereinafter made. Repeated amendments of the specification and claims were filed, while the Patent Office continuously rejected the application, citing the prior art in anticipation, and principally relying upon the English patent to Parkes and on descriptions of the coating of plates or sheets for making films contained in publications devoted to the art of photography; but after the final rejection in March, 1898, an appeal was prosecuted to the Board of Examiners in Chief, and its decision favored issuing the patent, the board substantially adopting the view that the prior art did not disclose means for successfully producing a photographic film of the kind specified in the Goodwin patent and claims.

The file wrapper and contents show that from the beginning Goodwin insisted upon the allowance of broad claims, referring in his specification to ornamental veneering and to the use of the solution in the decorative arts. He also specified a preferable fluid solution for his process; but, in view of the Patent Office citations suggesting films of celluloid and collodion, he limited the claims to the enumerated ingredients having the specified chemical properties; and he at all times maintained that the solution of nitrocellulose in nitrobenzole, flowed on a suitable surface to make a pellicle adapted for use in photography, was of the essence of his invention and was a generic discovery.

The history of the essential steps in the development of modern photography from the camera obscura is only partially narrated in the record of this case; and, though the expert witnesses have widely differed as to the effect of prior photographic processes and the char-

acter of modifications in the application of chemical principles, still I think it is fairly established by the proofs that in this field an important step forward in the art was made by Goodwin which led from past inefficiencies and failures to success.   The process by which at the present time images are instantaneously reproduced by the action of light on a sensitized flexible film chemically prepared, and by which, for example, the automatic movement of forms and shapes is obtained, would be difficult to comprehend even at this date were it not for the widespread interest evinced in the art by the amateur photographer since the perfection of Archer's dry plate process and augmented since the substitution of flexible and rollable sensitized films for the glass plates of the prior art.

In so far as material, the history of the photographic art shows that by Daguerre's process images were reproduced on sheet metal, the sensitizing agent being iodine, while in the Talbotype process, consisting of photography on paper, which quickly replaced the earlier metallic sheets, the paper was coated with a solution of iodine of silver and the negative suitably waxed before printing.   Following the latter process came the albumen process which was coated on glass plates, after which came the wet collodion process which consisted of coating the glass surface with ether and alcohol impregnated with iodine of potassium usable only before the sensitizing agencies became dry.   Then in 1855 came the Archer patent, No. 1,914, which described the use of collodion, hardening and drying the film, and removing it from the surface of the glass, and obviated many objections and difficulties inhering in the exposure of glass in the camera.   Collodion emulsion was next used, being poured over the glass plate and exposed to the light to take the picture; but there yet remained objections to the processes at that time commonly used in photography which were only removed by the adaptation of bromide of silver for the sensitizing medium and which ultimately led to the discovery, between the years 1878 and 1880, of the dry plate or gelatine emulsion process and consequent disappearance of the so-called wet process.

The record shows that roll holders for films were suggested at a comparatively early period (see Eastman Co. v. Blair Camera Co. [C. C.] 62 Fed. 400), but that their use was restricted, and that the art was continuing to look forward to a flexible and rollable film support which could be conveniently carried by the photographer in lieu of glass.   After the dry plate process became known, a demand immediately arose for a flexible film, and in 1885 such a film was devised and made practicable by Mr. George Eastman of the defendant company.   This film was of paper, coated with a gelatine bromide which became the negative and which was readily removable from the paper.   But there was still a desire for more satisfactory film supports; the witnesses Eastman and Dr. Chandler testifying that the paper stripping films were objectionable on account of the not infrequent appearance of the grain of the paper in the picture and on account of the thinness of the film which made it difficult to handle in the printing operation.   In spite of the success attained in the art by the paper films, they became subordinate to a transparent flexible

nitrocellulose film support, upon which the sensitive emulsion was flowed, which was put upon the market by the defendant, but which complainant claims was the discovery of Goodwin.

The patentee conceded in the Patent Office that patents for transparent flexible photographic films had previously been granted, much having been printed regarding supports from gelatine, collodion, and celluloid; yet he insisted, and the evidence supports his view, that all former attempts failed of their object and did not fulfill the requirements. In his replies to repeated rejections of his application by the Primary Examiner, he argued that his invention was essentially different in character and adaptation from the prior processes of Parkes, Davis, and others, and from the prior processes by which sheets of celluloid and shaved films were made for photographic purposes. He constantly maintained that his invention was a pellicle (originally called by him a foil) which, though peculiarly celluloidal, was nevertheless different from the ordinary celluloid and from collodion, and that his process of flowing the solution over a glass plate and then drying it was essentially different from other processes, and that by his process he was able to produce thin, tough, transparent, and flexible sheets which were rollable. None of the prior patents, he urged, were capable of producing such sheets or films either by a shaving or pressing operation, and consequently his method of flowing a solution of nitrocellulose for making film supports was new and novel.

The criticism of the defendant that the specification and claims contain unnecessary explanatory statements as to the chemical properties of the ingredients is perhaps not inapt, but the amplified amendments do not operate to enlarge the scope of the claims or introduce new subject-matter. The original invention remains. Chemists were aware of the fact that nitrobenzole and amyl acetate possessed nonhydrous and nonhygroscopic properties, that they were classed as solvents of nitrocellulose, guncotton, and pyroxyline; but, as already stated, Goodwin drew a sharp distinction between his solution and the solutions of collodion or celluloid, which was composed of nitrocellulose and camphor ordinarily dissolved in ether or alcohol, and expressly disclaimed the latter, all the while claiming an improvement in the specific combination of nitrocellulose dissolved in nitrobenzole or other nonhydrous or nonhygroscopic solvents and diluted in alcohol or its equivalent. There was also criticism by the defendant of the inclusion in the original application, in the class of high-boilers, of wood alcohol or prepared alcohol, a low-boiling, hydrous element, and of the inclusion of glacial acetic acid, but this is immaterial as those substances were omitted from the amended specification.

It is further urged that the specification is insufficient in that the proportions of the compounded ingredients are not given, nor the consistency of the menstrum to be spread or flowed upon a glass plate stated. Nevertheless I think that the process is described with sufficient clearness and fullness so that the skilled artisan would find no difficulty in producing a pellicle from such description. The terms "flowing and spreading" do not convey to the art radically different steps, and to "flow" the plastic material upon the supporting surface is thought to imply spreading or leveling whenever necessary; this to

depend upon the character of the film desired. Dr. Chandler, when asked how the process would be performed without directions as to proportions, testified:

"Well, Goodwin tells you what to use; nitrobenzole or acetate of amyl he mentions by name as the high-boiling solvents, and ethyl alcohol, methyl alcohol, ethyl acetate, methyl acetate, and acetone as diluents. All one would have to do, therefore, would be to dissolve his pyroxyline in either one of the high-boilers mentioned, using enough to accomplish the purpose, and dilute the solution thus obtained with either one of the diluents. One experiment would be sufficient to give him an idea of the proper quantity; then if he wanted to he could mix the high-boiler and the diluent together first and introduce the pyroxyline into the mixture, and if desirable he might reduce the quantity of the high-boiler or modify the proportions in any way that suited his convenience. The Goodwin patent does not undertake to teach people how to dissolve pyroxyline; that had been done for more than half a century. * * * What he teaches is the employment of certain specified solvents or their equivalents, which are of such character as to produce a solution which when evaporated will leave a film having the physical and chemical properties mentioned in the specification."

This version is challenged by the defendant, but not successfully. The patentee, in my opinion a pioneer inventor, no doubt had the legal right to embody in his amendments other solvents which he regarded as possessing substantially the same chemical properties as those specified originally.

[2] The general rule is that the interpretation to be placed on a patent is to be determined by the language of the grant, and that the proceedings of the Patent Office are immaterial unless, of course, the patentee by his acquiescence has accepted limitations imposed by the rejection of broader claims. Westinghouse Elec. & Mfg. Co. v. Condit Elec. Mfg. Co., 194 Fed. 427, 114 C. C. A. 389; Beach v. American Box-Mach. Co. (C. C.) 63 Fed. 597. Goodwin in filing new claims, making them narrower but still within the original specification and drawings, acted within his legal rights. General Elec. Co. v. Morgan-Gardner Elec. Co., 168 Fed. 52, 93 C. C. A. 474.

The Goodwin patent is not to be construed as meaning a mere solution of nitrocellulose, because in his original application the patentee stated that he dissolved nitrocellulose in nitrobenzole "or other solvent." The latter phrase, fairly interpreted, must be taken to mean, as the patentee no doubt intended that it should be taken, viz., a solution in nitrobenzole or its equivalent; and so also as to the diluent alcohol and the words "or other diluent." In the outstart Goodwin perhaps did not understand the chemical properties of his composition nor the effect of compounding high and low boiling ingredients, but his ignorance in that respect and his consequent omission to state the properties in the original application of all high or low boilers known in chemistry does not defeat the patent as long as the mode of operation achieving the result is sufficiently described in the application. Andrews et al. v. Cross (C. C.) 8 Fed. 269.

Was the patent in suit anticipated by the prior art? In the English patents to Parkes, No. 2,359 of 1855 and No. 1,123 of 1856, to which reference was made by the Examiner, there is contained a description of collodion sheets of sufficient thickness to support a photographic film. In the patent 1855 for elastic and adhesive compounds, Parkes

describes a solution of guncotton in wood naptha or other solvents. He states that the preparation may be used for waterproofing and various articles requiring properties similar to india rubber or gutta percha, and, while mentioning that guncotton has been used principally as a photographic agent, says that his object is to employ compounds of collodion for manufacturing purposes generally; and in his provisional specification of 1856, which, by the way, was abandoned, he stated that his invention of sheet collodion was usable as a substitute for glass in photography, and specified a thick layer of collodion formed on plate glass with a film of collodion thereon. He states that in making pictures the back of the collodion may be coated with a black varnish, etc. But it is important to note that the method of making his sheet support is not specified by him nor the method by which its thickness is controlled. The inference may fairly be drawn that Parkes simply intended that the sheet of collodion should be used in the same manner that a glass plate is used, and that it should possess equal firmness. He makes no reference whatever to the character of the solvents or their properties, nor to the application of the solution to make a thin, tough, transparent, and flexible sheet, and in my opinion he does not anticipate the patent in suit.

In the Parkes patent, No. 2,359, the enumerated solvents are vegetable naptha, alcohol, methylated alcohol, or other ether "or other solvents" of guncotton or pyroxyline; and according to Dr. Chandler, as these solvents were all low-boilers and hygroscopic, it was impossible to clearly flow the solution without puckering or wrinkling the sheet. But Prof. Main swears that, while it might be impossible to flow the solvent to produce the required sheet, yet in his opinion, when the solution was spread and leveled, a satisfactory transparent and flexible sheet was produced; still I am of opinion that the sheet to which Parkes referred in his later specification was more in the nature of a coating for a glass than of a film support, much less one for use in a roll-holder camera, and it therefore is not anticipatory.

The defendant further claims that transparent, flexible pellicles were available many years prior to the Goodwin invention but were not used on account of the great expense involved in manufacturing them in long strips for rolling. But the contrary appears by the testimony of the witnesses Bellsmith and Eastman.

The French patent to Ferrier was for a gelatine film with a layer of collodion poured upon it, but there is no suggestion in the description of a nitrocellulose support. The Beals patent, No. 239,425, describes a vegetable wax with camphor in a celluloid mixture which was to be employed in general use, it not being supposed at the date of the invention that the patentee's composition was usable for films; and the experimental test since made to show that films could be produced by compounding his ingredients, in the light of subsequent knowledge, is not to be considered to anticipate the claims in suit. In the Parkes United States patent, No. 265,337, is described a new solvent for nitrocellulose composed of camphor and other compounds but not the compounds of the Goodwin patent.

In the published articles of David at different times in the years 1881, 1882, and 1883, a transparent, flexible film support is suggested,

but the record fails to show that one was ever produced. The experiments of David, for such they were, consisted of celluloid sheets reduced in thickness by hydraulic pressure, and his object at the outstart was to produce a composition which would successfully take the place of glass plates, but subsequently (Les Mondes 1883 article) he aimed to produce a very thin, smooth, transparent, and solid sheet, to be used as a film support in photography. His earlier experimental sheets consisted of gelatine coated with fluid celluloid, and his description is not unlike the description of Fig. 3 of the Goodwin patent. He next tried to produce a satisfactory film consisting of a solution of celluloid, alcohol, and ether, and, according to the evidence, his last attempt was to make a film support of nitrocellulose by flowing a celluloid solution on a hot plate, using alcohol and ether as a diluent. In his addresses and published articles the composition or the solvents are not specified; but, conceding that celluloid consisted of a solution and composition closely allied to Goodwin's high and low boilers, et cetera, yet it is not shown that any of the David films was a marketable success. On the contrary, they were failures and incapable of producing the resultant of the Goodwin's process. By the Photographic News, vol. 25, p. 187, it appears not only that the David processes were experimental but also that they were incomplete and incapable of practical application, while his later thin sheets of collodion already mentioned were difficult to handle and too expensive for use in photography. Indeed, the witness Eastman, who at this time was deeply interested in the successful production of a flexible film, substantially testified that prior to the Reichenbach invention of 1889 no film support, aside from stripping paper films, was practicable for use in roll-holder cameras.

The defendant attaches importance to other prior patents, viz., the patents to Spill, to Ollion, and to Ellis, to prove the invalidity or limited scope of the Goodwin claims and to show that it was old in the art to dissolve nitrocellulose in a menstrum of nitrobenzole and then spread the solution on surfaces of one kind or another; but, after examining said patents, I believe that they are not anticipatory. The solution of celluloid in alcohol and ether was old. The flowing of collodion and gelatine and nitrocellulose was not new and nitrocellulose had been dissolved by various solvents; yet the combination of the various steps of the patent in suit, by which a film support for use in a roll-holder camera was produced by dissolving nitrocellulose in nitrobenzole or other nonhydrous and nonhygroscopic solvents and diluting the solution with alcohol or other hygroscopic element miscible with water and highly volatile, was new and novel. Of such a combination Goodwin was the original inventor, and his claims are entitled to a liberal construction. Prior to his application, pellicle supports only existed in a theory too vague and indefinite for reduction to practice at a time when the demand for flexible, transparent, and tough films seemed most earnest.

That benefits and advantages would flow from such a film support was thoroughly recognized in the art. The patents to Parkes and the addresses of David (the best references) suggest the possibilities of

such film supports, but mere suggestions in prior patents and publications do not anticipate.

[3] The rule is that anticipating patents and publications must disclose the invention without patentable change or alteration to make them anticipatory. Waterbury Buckle Co. v. Aston, 183 Fed. 120, 105 C. C. A. 410. If the anticipatory matter relied upon was capable of producing a satisfactory support for the film, the evidence relating thereto is not sufficiently persuasive of the fact. In the light of the invention in suit and subsequent developments in the film-making art, it is not improbable that the earlier processes might now be quite easily altered to attain the Goodwin result, and because of such probability this court is reluctant to give weight to the test films made by Prof. Main since this action was brought, in support of the assertion that the prior art described a process for successfully making films of the Goodwin type.

Has Goodwin solved the problem of making a pellicle for a photographic support, an undertaking wherein others before him failed? A specimen film filed in the Patent Office was exhibited at the hearing, and the file wrapper includes an affidavit of identification by one Crockett, who died in 1902. In appearance the specimen is transparent and very thin, but what the solvents were does not appear, though in an affidavit by Dr. Woodbury, inserted in the file wrapper, it is stated that such exhibit possessed qualities different from collodion, gelatine, or celluloid shavings. But no probative value is attached thereto as it was submitted several years subsequent to the Reichenbach application. There is, however, adequate evidence in the record that the Goodwin process was practicable and operative.

The defendant claims that, if the prior art celluloid disclosures were inoperative, then Goodwin likewise must be held to have failed to make a successful film support of his solution either with or without the diluent. It is conceded that in the beginning there were defects in the Goodwin film; they were either fogged or formed with bubbles therein; and there was undue delay in drying the solution after flowing, and moreover the film was greasy and did not fully respond to the involved claims, 7, 8, and 10. It is fairly shown, however, that later solutions (what are known as dopes in carboys containing either absolute wood alcohol or grain alcohol or amyl acetate or nitrobenzole as the eventual solvent), when mixed in substantially the manner described in the Goodwin patent, were not incapable of producing an operative film support. While I agree with the defendant that the operative films were not produced in exact conformity with the Goodwin process in that different high or low boilers, etc., were used, yet such modifications were unimportant in view of the broad invention and the underlying principles governing the determination of the questions herein involved, which, in my opinion, entitled the owners of the patent in suit to invoke the doctrine of equivalents. No limitations, therefore, confine the claims to nitrobenzole as the sole solvent or to any other single high or low boiling element.

[4] The patent law does not require that an inventor shall have succeeded in bringing his art to the highest degree of perfection; it

is enough if the skilled in the art understand the process and the specification points out a practical way of performing it. The Incandescent Lamp Patent, 159 U. S. 465, 16 Sup. Ct. 75, 40 L. Ed. 221; Telephone Cases, 126 U. S. 536, 8 Sup. Ct. 778, 31 L. Ed. 863. These provisions of the law were sufficiently complied with by the patentee.

In the discussion of the question of infringement, it is again necessary to refer to the Goodwin file wrapper and contents. After many rejections by the Primary Examiner of the Goodwin application, the Reichenbach application for a film support (patent No. 417,202, owned by the defendant) was filed, and interference was immediately declared involving Goodwin's broad claim for the process. Reichenbach, who had no knowledge at the time of his invention of Goodwin's application, describes his process as depositing or spreading a fluid solution of nitrocellulose and camphor upon a suitable surface. He disclaimed the issue of the interference and canceled his broad claims; but the broad claim of Goodwin was nevertheless again rejected on the David citation. Subsequently letters patent were granted to Reichenbach covering his specific process; i. e., a solution of nitrocellulose and camphor in methyl or wood alcohol, with a quantity of fusel oil and amyl acetate added. Goodwin had never claimed camphor as a solvent; but, on account of the resemblance of his solution to celluloid which contains camphor, the Examiner decided that interference with Reichenbach was proper.

[5] Presuming that his broad claim had been allowed, Goodwin practically conceded priority to Reichenbach's specific process, and consequently his successor in title is unquestionably estopped to assert infringement by film supports made in accordance with the Reichenbach formula. After its issuance, the Reichenbach patent was cited as anticipatory of Goodwin's broad claim until, on appeal to the Commissioner of Patents, it was held that such patent, being later than the Goodwin application, was not a proper citation. Meanwhile, however, the defendant company marketed film supports made in accordance with the Reichenbach process which were immediately regarded as solving the problem and were used largely in place of glass and in roll-holder cameras as a substitute for stripping paper films.

The complainant has proven that, in drying, the defendant's film support, produced from a solution of nitrocellulose containing camphor in the proportions stated in the Reichenbach patent, cockled or puckered, and that thereupon such proportion of camphor was appreciably diminished and fusel oil and amyl acetate added to overcome the objections. The expert witnesses have given discrepant testimony on all essential matters, but I am satisfied that the depreciation in the defendant's solution of the quantity of camphor and the addition of fusel oil and amyl acetate resulted in an infringement of the patent in suit. In departing from the specific formula of its own patent, the defendant utilized the equivalent of the method specified by Goodwin in his patent and achieved the same result. The Reichenbach solution was concededly prepared with approximately 60 per cent. of camphor, which, according to the proofs, was decreased from time to time to about 14 per cent. relative to about 22 parts

of nitrocellulose, a decrease in the quantity of camphor sufficient to overcome the asserted objections.

I am unable to accept the view that, either by the addition to defendant's process or the exclusion therefrom of amyl acetate, a high-boiling solvent, or of acetone, a low-boiling element, infringement is avoided. True enough defendant's modus operandi is somewhat different from Goodwin's, but the two processes are not distinguishable on principle, and to colorably change the solvents by modifying the Reichenbach proportions in the manner stated does not create a new process but seems simply to differently carry out one that is old and already known through the instrumentality of the patent which is the subject of this controversy. It is true that in the production of complainant's film supports nitrocellulose is not dissolved in nitrobenzole and alcohol alone, the specific solvents of Goodwin's invention. But the improvement in the film support is due to the combination of equivalent high and low boilers, and therefore the departure in its production is fairly within the scope of the claims. It is not improbable that certain of the new features or steps of the defendant involve novelty, but this of course would not justify infringement of complainant's broad invention.

It would serve no beneficial purpose to further discuss the evidence or the numerous chemical problems suggested in the briefs, for to do so would result in an opinion beyond reasonable length; but, aside from this, the court believes that the salient questions and defenses have been passed upon with sufficient elaboration.

As to the claims. The second, third, fourth, and fifth claims in suit are practically duplications of the first; the only difference being as to nomenclature of the essential elements. The seventh and eleventh claims omit the diluent; and though the high-boiling solvent alone will perhaps dissolve the nitrocellulose, yet as the defendant does not achieve its result without a diluent, said claims are not thought infringed.

It follows that the complainant is entitled to a decree, with costs for an injunction and accounting as to claims 1, 6, 8, 10, and 12, covering the process and product of the patent in suit, which in my estimation are infringed by the defendant company. So ordered.