**WITHEROW STEEL CORPORATION et al. v. DONNER STEEL CO., Inc.**

District Court W. D. New York. January 31, 1929.

No. 1043.

158

Locke, Babcock, Hollister & Brown, of Buffalo, N. Y., and Byrnes, Stebbins & Parmelee, of Pittsburgh, Pa. (Walter J. Blenko, Geo. E. Stebbins, and Clarence P. Byrnes, all of Pittsburgh, Pa., of counsel), for plaintiffs.

Kenefick, Cooke, Mitchell & Bass, of Buffalo, N. Y., and Green & McCallister, of Pittsburgh, Pa. (Lyman M. Bass, of Buffalo, N. Y., and Jonathan S. Green and Edgar W. McCallister, both of Pittsburgh, Pa., of counsel), for defendant.

HAZEL, District Judge. In this suit in equity plaintiffs, by supplementary bill, seek relief by injunction and damages for alleged infringement by defendant corporation of ten United States letters patent, viz.: Nos. 1,572,343, 1,577,430, 1,502,705, 1,516,069, 1,570,660, 1,600,782, 1,607,498, 1,607,445, 1,597,955, and 1,609,045. The original bill also alleges, as an additional cause of action, unfair trade by the defendant company in relation to the asserted acts of infringement, and, by the supplemental bill, that defendant continues and threatens to continue such acts, to the irreparable loss and injury of plaintiffs.

The Colonial Trust Company, as alleged, and as the evidence shows, has a mortgagee's title to the properties, including the various patents in suit owned by the plaintiff With-

erow Steel Corporation, which was acquired from its predecessor, the Witherow Steel Company, and, by reservations in the mortgage agreement, the Witherow Steel Corporation is exclusive licensee of all the involved patents, and, accordingly, I deem that both plaintiffs were properly joined.

All the enumerated patents (for convenience designated Witherow patents) relate to the manufacture of automobile axles in nearly finished form—that is, front axle blanks and rear axle shafts, produced in series or strings and then readily sheared into singles from which front axles and rear axles are later finished by forging or machining parts—and a few other metallic articles (not involved), by what is described herein as die rolling with flash and in a single pass.

The art of rolling and shaping white or molten metal ingots after reduction in size, in a broad sense, for commercial use, is very old. Modern die rolling, credited to Henry Cort in 1783, has greatly expanded, and, for perhaps fifty years or more, has been adapted for so-called parallel rolling and roll flattening (different types of die rolling) for shaping tie rods, concrete bars, plates, flats, rounds, angles, rails, knives, forks, coupling pins, and certain other metallic articles, each having uniform cross-section or a limited change in shape only. These limitations, as to what was accomplishable in rolling or die-rolling operations, were well understood, and, by Witherow's invention, a new art in a familiar field, or a special class of die rolling, is claimed to have been evolved or developed, achieving a new and distinctive result, which was followed by abandonment of old die-rolling methods of fabricating certain rolled, metallic articles of nonuniform type and dimensions, or so-called complex articles, including front axle blanks and rear axle shafts for use in automobiles.

The defenses interposed in the main are prior public use, prior patents, and publication, and specifically that plaintiffs' adaptations were performable on the old die-rolling machines—no new die-rolling machines being described in any of the patents—and accordingly, Witherow's concept was not a new art or method of die rolling as contemplated by section 4886, R. S.; in short, that die rolling complex articles and front axle blanks and rear axle shafts was inherent or a natural sequence in the customary die-rolling practices, and, further that neither the use of a declared rudimentary leader bar of the claims of certain Witherow patents, nor generally the rolling of blanks with a fin or flash, presented any serious difficulties of operation which were not remediable or surmountable by any one skilled in the rolling mill art.

To establish validity of the various patents in controversy and infringement by defendant of the 75 collective claims, and in support of the various defenses, a large number of witnesses were sworn on both sides, as the record, consisting of nearly 4,000 typewritten pages, and voluminous briefs, readily disclose.

Defendant's confidence in its belief that all the involved patents are clearly invalid is seemingly apparent by the fact that admittedly it began to die roll axle blanks and shafts for use in automobiles at its plant, after an inspection by its president of Witherow's operations in such productions under the patents, adapting, as plaintiff avers, substantially the same mode of operation, and selling its axle forms to the automobile industry.

The questions submitted are in many aspects highly technical and complicated. We are not particularly interested in a rolling mill proper as a machine, or with mechanical parts, but our distinctive concern is with an art or process by which certain articles are fabricated. At the outset, a brief definition of a few of the terms freely used at the hearing as bearing upon the principles specified in the patents and their application may not be amiss. Parallel rolling is a known method of rolling a hot metal bar of uniform cross-sectional size and form between a pair of smooth or grooved rolls for reducing its thickness and altering its shape; and, in die rolling a round bar, uniform grooves are graved or cut into the periphery of the roll or rolls, one ordinarily disposed above the other in their operations. The ordinary hot leader or bar is formed or pressed to the required size from a huge billet, and the leader in its plastic state is fed into the rolling pass between the two rolls for compression, reducing the thickness and lengthening and shaping to form the particular article or series of articles. There is also a well-known shaping and forming of the leader by a method of roll flattening and rounding of parts. Defendant's expert, Prof. Trinks, tersely and accurately defined die rolling to be "any rolling in which there is a variation in the contour of at least one of the two grooves of the rolls." In parallel rolling the leader bar engages the pass or groove formed in a way to avoid irregular fins or overfills, since the material, if incumbered with such excess metal, is admittedly, in ordinary rolling with grooved rolls, a detriment and re-

garded as either commercially useless or as involving expense to put the material or articles in proper condition. Fins or overfills comprise thin extra portions of metal exuded sidewise from between grooved rolls, and, in common practice, to avoid them (for they may lap over the material or spread in such manner as to break the rolls), the roll surfaces were suitably designed or adjusted, or the leader, in parallel rolling, for example, made narrower than the grooves to eliminate the evil. In ordinary rolling, the leader generally fits into the groove, and may, in parts, be either longer or shorter than the matrix portion on the periphery of the rolls. Complex articles are understood to be die rolled and comprise articles requiring reduction in size or thickening at intermediate parts, or where the cross section and center lengths are dissimilar, as, for example, in front and rear axles which, by their contour, are required to have thinner and narrower portions between, but not at, the ends. Rollset implies spacing and adjustment of the rolls to enable the exuding metal fin, overfill, or flash, as Witherow calls it, to spread sidewise of the groove; while the rudimentary leader, so-called in the specification and claims, is said to be distinguishable by its shape from a leader bar used in ordinary rolling, in that its length is reshaped relative to the pass and roll grooving, and corresponding to desired intermediate portions of the blank, or center to center length requirements. In die rolling Witherow axle blanks and shafts, definite flash zones, intentionally and with an essential object, appear uniformly along the opposite sides of each blank in a string of blanks, unlike the irregular sized and ragged fin or overfill in common rolling, and unlike forging flash which concededly lacks purpose or function. Defendant, however, defines flash as an ordinary fin or overfill with which the art has long been familiar, and, in the main, urges that the Witherow uniform flash must, on proper construction of the claims including such element, be limited to its formation in flash gutters during close contact of the two rolls, one placed above or adjoining the other. By tolerance is implied a deviation in dimensional length requirements of the matriced designs and the axle blanks and shafts, or an agreed safety zone allowance, as counsel for defendant puts it, for the length variations within which the blanks or forms are acceptable to the automobile manufacturers.

Before adverting to the original disclosure and claims in suit, it will be an aid to understanding the intendment to refer to the earlier manner in which automobile axles or shafts were produced. There were several known methods of rolling or fabrication—first, by forming and shaping a front axle blank by the drop forging process, wherein the original impression was separately formed by the use of two heavy metallic dies. Hot metal was put into depressions on the roll surfaces, and both metal and rolls were forcibly driven together for shaping a front axle blank; while rear axle shafts were either drop forged or made by a so-called Ajax process of rolling or machining from bars. The Ajax method required several manual passes of the leader bar forwards and backwards between the matriced rolls to form a unit, which proved to be a very slow method in production, and concededly was unsatisfactory. By Witherow's process, the blanks are rapidly formed by the die rolls from the rudimentary leader, the speed of production corresponding to the speed of the run of the mill, and are formed connectedly in strings of 40 to 50 to each leader, or a single blank in perhaps less than a second. It is not denied that this method of die rolling axle blanks was first practiced at the Witherow plant. It is elicited that the modern method of assembling motorcar parts, prior to patented conceptions, required manufacturers to constantly have on hand a large supply of axle forms (sometimes a three months' supply) for ready fitting and adjustment to chassis. The demand for satisfactory production of axle forms by speedier methods than was possible by drop forging, or by the Ajaxing method, or by machining, was most urgent, since it was supposed that, if the blanks could be satisfactorily die rolled, they could be bought cheaper at the mill than produced by any known methods.

In as few words as possible I have included in the above outline, omitting some details, the relevant conditions of the art of rolling and die rolling complex metal shapes and forms before the Witherow invention. In 1920, while engaged, as the evidence shows, in ordinary rolling operations, the patentee conceived the idea of supplying the then pressing demand for speedier production of motorcar axle blanks. He essayed to shape and form them by the old principle of rolling parallel and by eliminating undesirable fins or overfills, but he signally failed in all his endeavors and tests. The blanks produced by him could not be successfully used. In each instance they were defective, unaligned, bent, and incessantly longer or shorter than the necessary requirements prescribed by the prospective customer. They were ir-

regular in size and incumbered with excessive and useless metallic fins, notwithstanding repeated trials and adjustments of the rolls. At great expense he struggled onward, hoping finally to solve the problem of producing blanks to meet the specified demands as to tolerances and lengths to fit connecting parts in the automobile chassis. After various failures, he conceived that the irregular metal expressed at the sides of the forms was the serious obstacle to achievement, and he then resolved upon a wide departure from the ordinary die-rolling practices. After many tests and experiments of his new idea, under varying conditions with different kinds and shapes of leader bars and matriced rolls, he eventually succeeded in getting a shapely and satisfactory contour and configuration. With a rudimentary leader bar, reshaped to obtain center to center requirements, he was able to produce axle blanks connected together in series, which made it possible for him to supply the trade in large quantities. He had nearly accomplished his full object. It became unnecessary for automobile manufacturers dealing with him to constantly carry a large stock of axles for use in motorcar assembly, for by his process he at all times was ready to supply dimensional requirements of axle blanks and fill demands for delivery. He realized, during his experiments, the importance of dimensional accuracy or center to center lengths and spacings, which were not securable in the adaptation of old rolling practices. By providing intentional flash to the intermediate lengths, where reduction was greater than at other parts, instead of avoiding it by roll adjustment, or in other ways, he secured control of the lengths, shunned harmful skidding of the rolls, which had been a troublesome interference, and secured rigidity of the material, in addition to aiding the annealing of the forms, after severance from the strings, by allowing the free circulation of gases about them. He did not produce a completed product. It was not his object to do so. For, after the units were separated from the strings, it was necessary for the automobile manufacturer to forge their ends or machine them somewhat for his particular uses.

The primal inquiry is whether Witherow in reality accomplished something that was unknown to the art—something new and novel—a new system of die rolling complex metallic instrumentalities, and something that the skilled in the art could not make or adapt without having recourse to invention. In a broad sense, as already remarked, die rolling various specified metal articles of diverse form and length, which necessitated grooving the rolls, was very old; but a number of witnesses, engaged in steel manufacture and long familiar with the rolling and forging art, including roll flattening and parallel rolling, testified that front axle blanks and rear axle shafts were not rollable by any method known to them prior to Witherow's evolvement. While, on the other hand, skilled witnesses for defendant, in some instances, challenge Witherow's claims. In argument it is vigorously contended that the Witherow basic patent, when properly construed, does not at all disclose a new method of die rolling. It is said that axle forms had previously been rolled and marketed, meaning, I take it, by the Ajax process; and, even though first successfully die rolled in strings by Witherow, his adaptation was not patentably new, since the basis of his accomplishment wholly rests on known practical methods. This contention requires particular reference to the prior patents and publications in comparison with Witherow's innovation.

### Patent No. 1,572,343.

■ It is claimed to be basically broad and comprehensive, covering different types of complex and simple articles including (Figs. 1–3) a front axle form or blank for special uses. The specification refers to difficulties in die rolling articles owing to "nonuniformity of product," resulting in losses from scrapping rolled material, and to expense involved in dressing rolls, especially in connection with die rolling axle blanks and the like in large quantities, where accuracy in center to center length was an important factor. Reference is made to certain earlier patents and operative failures arising from defective fin or overfill and the natural tendency of rolls to spring apart, "particularly where thin bodies or blanks are being produced." It is pointed out that as to one form of the invention "a definitely located flash," adapted to be sheared away, is provided; also rolling various objects is contemplated, of varying sizes to fixed dimensions, so as to produce blanks connected with each other at the ends, or connected by a gating in preparation for severance and for later forging and machining; that the blanks are preferably rolled from uniform cross-sectional leaders of rudimentary dimensions corresponding to a finished intermediate portion of the axle blank. The rudimentary leader is described as one preferably imparting to it an I-beam shape in cross section and proportioned to form a connected string of blanks. The specification proceeds:

"It will be noted that the blanks as they come from the rolls are provided with a flash 7, the width of which varies generally in accordance with the reduction and deforming produced by the die rolls on the leader. This flash is easily trimmed away either before or after performing the finishing operations on the blank."

Exactness in length control and dimensions, measured from a point in one blank to a point on the next succeeding blank and so throughout the string, were thus attained—a result, plaintiff insists, and found to be true, that was unattainable in old adaptations and processes.

It was deposed by Prof. Sauveur, an eminent metallurgist, as bearing upon utility, that front axle blanks, formed in accordance with the described process, have a grain structure superior to blanks made by forging and reforging, and were stronger and more durable, especially at the forked arm end of a complete front axle. He explained that, in forging, the grain of the metal was not so well aligned as in die rolling; that the grain runs crosswise and becomes distorted by the heavy hammering (Exhibits, photos 46, 47), subjecting the axle to breakage at the weakened point. Die-rolled blanks, he averred, possessed more firmness and evenness, resulting in decreasing or preventing porosity of the metal. Sherlock, defendant's metallurgist, differed somewhat as to the effect of porosity, but this variance is not of material importance, for it is fairly shown that in forging operations the contour of the grain weakens the structure when put under great pressure or strain.

Claims 3 to 11, covering process and articles, are in issue, of which claims 6 and 9 are typical, and read as follows:

Claim 6. "As an article of manufacture, a string of die rolled ferrous blanks reduced while hot throughout at least the major portion of the length of each blank by the die rolling operation, said blanks having flash on diametrically opposite sides thereof in substantially the median plane of the string of blanks and having accurately spaced apart portions along the string of blanks providing portions on blanks severed from the string and adapted for reworking, said blanks also having other portions of substantially finished dimensions and contour."

Claim 9. "The method of forming metal articles, comprising passing a leader between die rolls adapted to form a string of connected blanks, forming accurately spaced portions along the string adapted for reforging, permitting excess metal to flow sidewise in a substantially unrestricted manner to form flash integral with the blanks, separating the blanks and trimming the flash, and thereafter reheating and forging at least certain portions of the blanks."

The essential elements of claim 9 include (1) a leader forming a string of connected blanks; (2) forming accurately spaced portions along the series of blanks adapted for reforging; (3) a free sidewise flow of metal to form flash alongside the blank; (4) separating the blanks and trimming the flash; and (5) reheating and reforging parts of the blanks.

To analyze all the prior patents to establish invalidity of the claims or narrowing of scope is not an easy task, and therefore those have been selected having the nearest approach to the Witherow process, or to which weight was given in argument.

It is true that the word "flash" is mentioned in various prior patents, and its impediment or claimed usefulness shown. In some instances, provision was made for rolling it back to overcome its effect, or impairment of the rolled article. It is found in Richardson's patent, No. 136,620, of March 11, 1873, and relates to the Ajax method for eliminating roll spring producing the flash, by rolling it back into the material, thus becoming a constituent part of the form. Richardson did not have in mind the use of flash for controlling length needs or securing straightness of his axle forms, nor to reduce roll spring, and therefore his patent is neither anticipatory nor of limiting significance.

In Merriam's patent, No. 596,899, there is a lengthwise web and spacing between the series of balls. After forming the balls, the web had to be punched out; the rolls being apart and the webs formed from a leader bar. In neither instance was the excess metal used for securing length control or center to center dimensions. The front axle forms in strings could not have been produced by these methods or without the use of the combined elements of claim 9 in issue. In fairness, the present invention must be judged by its accomplishment, rather than by bare suggestions that ordinary roller methods by modification and alterations could have achieved the successful production of front axle forms. To my mind it was not merely a contemplation of decreasing or removing roll spring difficulties by using flash gutters to keep sectional roll points in contact with each other in lieu of spacing them apart, as defendant contends.

The German patent, No. 111,095, and British patent, No. 23,906, also fail to disclose

or suggest Witherow's adaptation; while the Brown patent, No. 333,106, describes a roller press pressing nuts on a flat bar. None of the ball-fabricating patents show any marked extrusion, but simply a shaping of the articles from the bar, leaving the flat side metal or connecting web which is cut off to loosen the balls; while in the Witherow process, as already stated, there is a decided functional extrusion varying in cross section along the length of the article.

It was also impossible to die roll rear axle shafts in strings by any known adaptations, since the difference in the cross-sectional areas of rear shafts prevented such methods. To die roll them by any known process, as defendant's expert Wadsworth agrees, would not result in tapering lengths, but in uniform cross-sectional length, wherein flash would not be essential. The proofs show that the strictest accuracy was required in tolerance and intermediate lengths in order to fit the terminals into connecting parts in the chassis, and smaller cross-sectional area at the spline end was required than at the wheel end, and this needed accurate rounding of the tapered portions. Although tolerances between the terminals were slight, they nevertheless were essentially requisite. The patent to Aldrich, No. 192,669, for picker teeth, shows a flash adjacent to the points, without reduction of portions of the body length. It has no bearing, since it shows no rudimentary leader, no length requirements from one point to another, or need of material reduction between central parts.

█ Importance is attached to arguments by counsel in the Patent Office during the prosecution of Witherow's application, in that unfavorable admissions were made regarding the Merriam and Aldrich patents and two British patents, Nos. 622 and 23,906—that admissions and concessions were tendered regarding adjustment of die rolls and trimming away flash, as described in patent No. 1,572,343, which had the effect of importing into the claims a limitation by which the flash is formed in gutters to overcome roll spring, in order to save them from invalidity. The remarks of counsel, however, taken from the file wrapper, do not bear out this view. The words "flash gutter" do not appear in the claims or in the amendment from which the criticism is drawn, and the word "flash," used in the description, in my opinion, is not limited to flash exuded or spread into flash gutters. The element of flash gutters in claims 1 and 2, not here involved, does not warrant reading that element into the claims in issue. General Electric Co. v. E. H. Freeman Elec.

Co. (C. C.) 190 F. 34; Boyer v. Keller Tool Co. (C. C. A.) 127 F. 130. In any event, interpretation and construction of claims does not depend upon pro and con arguments in the Patent Office on application for patent issuance, and, unless the inventor acquiesced in limitations imposed upon him, as evidenced by rejection of broader claims, there is no merit found in this contention. Goodwin Film Co. v. Eastman Kodak Co. (D. C.) 207 F. 357; Auto Pneumatic Action Co. v. Kindler & Collins (C. C. A.) 247 F. 328; A. G. Spalding & Bros. v. Wanamaker (C. C. A.) 256 F. 533; Campbell Metal Window Corp. v. Pomeroy & Co. (D. C.) 300 F. 872.

█ It is next contended that the gating 6 in Figs. 1, 2, controls center to center distance instead of the flash or overfill. The specification points out that the gating serves a double purpose, to wit, showing the place of cutting or shearing adjacent blanks; and, second, to prevent roll slipping to obtain efficient rolling from center to center. Figs. 1, 2, however, in connection with Fig. 8 of patent No. 1,577,430, specifies the use of gating at parts of the blank where there is no flash. Both Witherow and Expert Sessions testified that the gating was impracticable and attributed the Figs. 1, 2, in the drawing to a draftsman's error. But, on the whole, I think, the credit attributed to the gating for securing accuracy in lengths is not substantiated. Many prior patents were mentioned wherein separate elements appear that are included in the process of the instant patent, but, since they are not shown as a combination of steps co-operating together, they are not entitled to weight or further analysis. It may be shown, of course, by the analogous art that combining old elements or steps in a process, or aggregating parts into an assemblage of elements or steps did not involve invention, but this rule does not fit this case—a case involving a new function and made to attain a new product. Defendant's witnesses do not say that the prior art in any patent or publication embodies the steps or elements of the claims. Indeed, Prof. Trinks and Expert Wadsworth frankly admitted that they had never heard of the various steps working together to die roll front and rear axle forms, and, though die rolling in box passes was known to prevent fin or overfill, and in open passes to produce it, yet nowhere is shown a definitely located flash used for a particular purpose, or wherein flash was in contemplation as a step in the process. To anticipate a patent for a process, a prior patent must have contemplated the use of the process. Carnegie Steel Co. v. Cambria Iron Co., 185

U. S. 403, 423, 22 S. Ct. 698, 46 L. Ed. 968.

There are, however, various prior patents that were urged by defendant as having an important bearing on the question of anticipation or the scope of the claims, which may briefly be considered. In the Loughran patent, No. 72,512, for clevis-blanks, the rolls have grooves and notches in their rounded surfaces. In pressing out the shape of the article, Wadsworth says the length of the legs requires length dimensions; and in Acheson and Ridley, and patent No. 200,603 of 1878, together with the Brown and Aldrich patents for die rolling various articles, there are articles wherein a certain standard of dimensions is required, but, since they fail, as it seems to me, in the feature of accuracy of length proportions from center to center, which, as before stated, is a prominent feature in Witherow's conception, they are not anticipatory. The Acheson and Ridley patent for making hoes was cited against Witherow in the Patent Office. There two box passes are shown with rolls set apart for excess metal, one roll forming the article with a web portion at the ends, the hoes being of uniform width, while the leader is shaped in the top roll and the hoes in the lower. It was not possible to form web or flash at opposite sides of the article by that patent. The Aldrich patent indicates specific length requirements in forming the rolled article; but it lacks a uniform or characteristic leader which contributed so favorably to rolling axle forms. The skillful mechanic, in my opinion, without knowledge of Witherow's disclosure, and having these old patents before him, could not have altered or modified the Aldrich or Acheson apparatus to die roll complex articles of the axle blank type.

In Loughran patent, No. 212,241, of 1879, for a string of harrow teeth, an article of the complex class is shown, but the principle of Witherow's disclosure is not apparent. True, there were matriced rolls geared together, and overfill for shearing from the thin sections, and the parts were later reforged, but Loughran was not confronted with the intricacies facing Witherow, of producing articles of varying length dimensions and within close tolerances. He says he is able to produce a more perfect article of uniform size and better texture; but, according to the evidence before me, he could not roll articles of center to center requirements with lengthwise reduction of parts and intentional flash alongside. Moreover, his use of rectangular bars and shearing fin or overfill directly on its formation would obviously have prevented string production. If automobile axle blanks could have been rolled by Loughran, or if they could have been produced by making mechanical alterations in his rolls, it is hardly conceivable that the skilled engineer and expert roller would not have taken advantage of his adaptation. Witherow's tests and expenditure of large amounts of money, and the evidence of steel rollers and steel fabricators strongly negatives defendant's suggestion.

The Hirsch patent, No. 480,325, is said to contain all the elements except the feature of reworking the axle blanks. I do not agree with the contention. If the rolls were in contact in Hirsch's adaptation, with the articles rolled and shaped in strings, a leader of oval or flat shape in cross section and flash to aid the production, it might justly be considered a good reference, but the description shows neither flash nor overfill in his rolling. The blanks or articles apparently are stamped out, and producing them by Witherow's principle is not evidenced. The Roger patent, No. 180,930, for a sucker rod, describes a device of the open pass type, and, though capable of forming flash or overfill, its practicability to roll an axle blank is not apparent. In its operation, flash was not produced, and, moreover, there were no length requirements to his article. The Refior patent was applied for April 12, 1921, after Witherow's rolling operation. Its operativeness was seriously questioned by plaintiff's expert witness Sessions. It lacked a characteristic leader bar reshaped in all its parts, as Witherow used. Wadsworth agreed that, without a leader having portions reduced, it could not be drawn through the roll pass. Hill's patent for axle-skelps seemingly relates to a flattening operation, as the wide rolls permitted the metal to spread into the article on pressing down the rolls. There is no rudimentary leader and no fin or flash resulted because the metal filled the groove and forging gave it shape. It is not, as contended, a disclosure of Witherow's type of die rolling. The German patent No. 111,095, for ball machine, and British patent to Grant, No. 23,906, cited at the Patent Office against Witherow's application, the two Rowley axle rolling patents, the Odwalt machine, the Ajax type of rolls, the two Baehr patents, and British patent to Klatte for rudimentary leader, and Ludvigsen for toe calk patent relating to gating between calks, in view of what has already been said in relation to other citations, may be passed without special comment other than to remark that in none is found the combined steps for practicing the Witherow process or sufficient reason for limiting the scope of the claims. Nor do I find anything in either the Tunner Book or

the Beck Book, "Die Geschichte des Eisens," for die rolling coins, of a limiting character with relation to any of the patents considered herein. That the Stahl und Eisen article of 1912 recognized for many years that endeavors were made in the art to roll complex articles or articles of various types, which had to be forged or stamped out of the metal, would seem to be a tribute to Witherow's invention. However, the described rolls were differently arranged and were incapable of rotating continuously, and consequently articles could not be produced in strings. The described method is not unlike the Ajax process, and the mode of operation, not unlikely, was based on Odwalt's method of rocking the lower roll, and, owing to the mechanism of the gearing, a single blank only can be inserted in the pass. It was necessary in some instances to forge the piece twice—once at each end. Sessions describes the method as one of rock forging; the article is not formed with flash, and a rudimentary leader bar is not used. The dies, cut in the roll, form only a part of a rounded blank, and evidently there was no extrusion of metal. The Witherow invention was not of a roller forging type, as suggested by defendant; and claims referring to the word "forging" in claim 3, or "reforging" in claim 9, interpreted in the light of the specification, are thought simply to mean forging various parts of the blank. The term "forging," I agree with plaintiff's counsel, can be given no broader import than the term "reworking" used in claims 4 to 8, inclusive.

The entire record sufficiently shows that Witherow's patented method was one of unique die rolling of axle blanks and for later reworking their ends by either forging or machining, or machining only, as shown on page 2, lines 7 to 10 and lines 17 to 39, of the specification. None of the prior patents or publications could successfully die roll front or rear axle blanks in strings for cutting and finishing, and the presumption obtains that none of the citations were practicable or useful. Cimiotti Unhairing Co. v. American Unhairing Mach. Co. (C. C. A.) 115 F. 498, affirmed 198 U. S. 399, 25 S. Ct. 697, 49 L. Ed. 1100.

I again make reference to the Merriam patent, inasmuch as defendant, after the case was closed, moved to take additional testimony in relation thereto. The description of the Merriam patent reveals a circular rod which is passed between the rolls B having suitably grooved recesses shown in Fig. E'. The rounded depressions in the rolls are filled with molten metal, while thin portions of the metal flow out lengthwise on opposite sides of the balls, as already mentioned, and in spaces between them. The web does not perform a definite function as does the flash in plaintiff's method. There are two rolls positioned in the rear of the forming rolls (Figs. C and D) which punch out the balls and sever them from the web or flash. It has small spacing along the string, but lacks the accurate spacing adapted for reforging, and is without length or center to center requirements. In plaintiff's reply brief, it was said that the rolls, when placed in the mill, are so placed that their peripheral surfaces are in contact so that, in passing the leader through, they jump apart to enable the roll-set to form flash. This statement, however, was withdrawn by plaintiff's counsel at the hearing on the motion, it being admitted that the evidence does not show defendant's rolls in peripheral contact. The limitation reads, "A set or pair of die rolls having matrix portions therein in peripheral contact with the line of contact of the rolls lying in substantially the median plane"; but the other claims do not contain this restriction. It is therefore conceded that defendant does not, in its operation, infringe claim 8, since the limitation is not readable into the other claims; but this has no bearing on other claims, and does not negative infringement if defendant uses the particular process described in the other combinations. In such a situation, the presumption arises that the limitation was designedly omitted from the other claims. Ryder v. Schlichter (C. C. A. 3d Cir.) 126 F. 487. The Exhibit A, introduced on the motion, was not rolled by a Merriam ball machine or mill. It does not possess the Witherow characteristics, and obviously an axle form cannot be rolled by following the directions of the Merriam patent. Indeed, the specification states that in molding the balls, he adapts blunt, flat-faced dies instead of sharp cutting edges, and that he places the rolls a short distance apart to enable the web formed thereby to keep the balls in continuous strings. Plaintiff's rear axle forms are produced by an entirely different method. Insufficient reason appears for taking additional evidence, and the motion is overruled.

There was much testimony bearing on prior use, but none covering die rolling of complex axle forms, except the Ajax method, which the experts agree was on a different principle and incapable of operation, as shown in Witherow's patent. The prior use testimony does not successfully negative novelty of the claims with which we are now concerned. I have in mind the various exhibit

die-rolled articles by the Cleveland Hardware Company, particularly Exhibits 2–B, 2–A, X, R, and Y, consisting of so-called complex or deformed blanks and shapes. I have noted the flat and circular sections of the exhibits, and, in some instances, the cross-sectional areas and formation of fins or overfills, including the evidence that certain blanks were connected together for string production. I have noticed the evidence relating to the arrangement of the rolls or so-called roll-set; but I do not regard such articles or method of operation by which they were rolled as anticipatory. The underlying process in suit is distinguished from the processes by which the exhibit articles were fabricated. It is true that it was not necessary that they should closely conform to the exact shape of Witherow's product, but, when it is convincingly established that the latter required rigid dimensions as to length and thickness and spacings or tolerances to impart a distinctive shaping to meet industrial demands for fitting them into connecting parts, then a close examination of the prior use testimony is demanded. It required more than the skill of an ordinary mechanic or engineer to successfully roll axle forms by the old mill and instrumentalities.

The accomplishment of the inventor strengthened the presumption of novelty from the grant of the patent, and, before overthrowing this presumption, the evidence relating to prior use of complex articles must be "so persuasive as to leave no room for doubt or controversy." It is evidenced that, on one occasion before the present invention, the Cleveland Hardware Company contemplated rolling Ford front axle blanks having a varying I-beam cross section in the middle, and was told by its skilled foreman, Kappelle, that it could not be done successfully, and Ford orders for axle blanks were produced by its common method. The witness Gotsch said that the mill could not roll with flash; and Lewis, that it was regarded as a sin to allow fin or flash on a bar, that in his practice, when fin or flash appeared at portions requiring certain length, a redesigning of the rolls for eliminating it was necessary; while Rae of the Oliver Iron & Steel Company, declared that on the occurrence of overfill the material was scrapped as being unserviceable. The language of the Supreme Court in Eibel Process Co. v. Paper Co., 261 U. S. at page 60, 43 S. Ct. 327, 67 L. Ed. 523, is apposite:

"Indeed when we consider the indisputable fact that Eibel's successful experiment at Rhinelander and his application for a patent surprised the whole paper trade, and that for a short time many held back from risking so radical a change and then all adopted it, oral evidence that some persons had discovered the source of trouble and the means of remedying it some years before Eibel is incredible."

See, also, Dubilier Condenser Corp. v. N. Y. Coil Co. (C. C. A.) 20 F.(2d) 723.

Plaintiff challenges the origin of the exhibit prior uses articles, asserting that in all probability they were recently rolled or rolled after the invention, and the alterations and erasures in certain book entries seem to support this criticism. Some of the exhibit complex articles were taken from the rollers' huts at the factory where they were kept, and a few others were rolled a short time before the trial, duplicates of the originals which had been destroyed. Whether the duplicates were ever used for commercial purposes does not appear. The dates of rolling the originals depend wholly on the recollection of witnesses, without any corroboratory record entries to inform the court whether they were fabricated by the ordinary die rolling without overfill or flash. The Bailey hanger (Exhibit 2–a) shows a variation of length at the ends, but it has no rigid length between ends as in axle blanks, and there is no flash or fin or heavy reduction of intermediate parts of the hanger. Defendant asserts that at one time the Bailey hanger was rolled with flash, but this method was abandoned for rolling without flash. It was testified that a test roll by defendant of open hearth steel, shortly before the trial, showed flash on the hangers, while the hanger rolled out of Bessemer steel was of different condition than those used formerly for rolling the hangers. Tank strap (Exhibit 2–B) is claimed to have been rolled 7 or 8 years ago, since Witherow's invention, but tank straps are rolled without flash or accurate center requirements, or reduced parts between the ends, while the grooving was in one roll only. The Q-shaft iron was produced without flash in geared, matriced rolls; the sample, Kappelle testified, being 32 years old, its body portion of uniform cross section with slight tapering at the end. By what process the shaft was rolled does not appear. Exhibit R, a buggy loop, was rolled, it is said, many years ago without flash. Neither the Exhibits S, a clevis-iron; V, a corner iron for truck; W, Ford pedal breakdown bar; or Y, for Ford speed notch—come within the terms of the Witherow invention; each lacking length requirements or reduction of intermediate parts or definitely located flash. They evi-

dently were produced either by roll flattening, or failed to impart length requirements. Actual sales or commercial use of the rolled articles, other than the Bailey hanger and the buggy loop, were not satisfactorily shown; and force is given to plaintiff's contention that these articles represented abandoned experiments or were rolled by old processes. The prior use or fabrication by Jones & Laughlin, Carnegie Steel Company, Republic Steel Company, and Scranton Company, of guy wire clamps, concrete bars, etc., is subject to a similar criticism of either having been rolled without flash, length requirements, or reduction of intermediate portions, or being produced by means of ordinary roll flattening. Generally speaking, testimony unaccompanied by corroboratory writing as to die rolling the articles in substantially the same way as plaintiff's method fails to meet the severe test of prior use. Douglas Pectin Corp. v. Armour & Co. (C. C. A.) 27 F.(2d) 814.

Defendant has not sustained the burden of proof placed upon it by the patent laws. The articles relied upon are materially different from articles and forms that were rollable only by the process in suit. It has long been the rule in patent causes that every reasonable doubt must be resolved against a defendant relying on prior use to defeat a patent. This rule applies to the characteristics of the articles and means for their production. The patent, in my opinion, is not anticipated by prior patents or publications, oral testimony of old die-rolling processes, or prior use.

The claims in controversy are entitled to a broad construction—one that will cover the generic invention and protect the inventor from appropriation and infringement by equivalent means. Witherow was the first, in my opinion, to die roll articles with an elemental leader bar, designated in the patent as a rudimentary leader, in combination with other steps and elements. He was the first to design and use peripheral grooves in the rolls of varying cross-sectional dimensions for rolling strings of articles, including front axle blanks and rear axle shafts, which were later cut into units; the said articles having intermediate portions of varying dimensions requiring reduction in diameter and with fixed center to center tolerances, and a definitely located flash extending along the intermediate portions of the blank, thereby securing length control and contour, and adapted to be cut or shorn off. It was not merely the application of an old process to a new subject. On the contrary, the old adaptations, I repeat, were unable to die roll front and rear axle blanks. The evidence establishes that his achievement, though perhaps akin to an analogous subject and method, nevertheless required changes and alterations in their application which developed a new and distinctive result; one that not only was beyond the contemplation of the old process, but one which in fact required the exercise of the inventive faculty to make practicable new and original ideas and conceptions.

It is claimed that the patents granted subsequent to the first patent are of progressive growth and evolution, and that they contemplate betterment by standardizing the structure, simplifying production, facilitating supply in accordance with the demands of the trade, and devising improvements based on experiments at various stages of operation of the earlier process, which was of practical and economic value, but which became more serviceable by the latter achievements.

### Patent No. 1,577,430.

This patent relates to a special form of rear axle shaft, for use in automobiles, which is subject to torsional strains from applying the clutch of the car or from other vehicular stresses. The specification states:

"Heretofore shafts of this nature have been taper rolled by eccentric rolls, have been turned individually, or forged singly to give the varying cross-sectional dimensions in different parts as required by the automobile manufacturers. Such methods are only capable of a limited production and necessarily the cost of the shafts is considerable.

"I have found that die-rolling as herein disclosed is particularly desirable in articles such as axles or other bodies adapted for torsional strains. The die-rolling process gives rise to an unusually fine and compact grain structure and etched sections of articles produced by my process show that the grains adjacent the exterior of the article are disposed in a substantially continuous manner extending longitudinally of the article and closely following the general contour of the blank. The line of the grains changes gradually and toward the center of the bar merges into a grain structure showing lines substantially parallel to the axis of the bar. The absence of spots showing porous grain structure such as are generally found in forged articles of this character is marked."

The object of the patentee was to produce, by die rolling in a single pass—the rolls being suitably graved—a compact and uniform grain structure such as prior rear axle shafts did not possess. The shafts were

rolled in long strings connected at their ends, or by a grating, as described in Witherow's first patent, from a specially shaped leader bar, which was rolled from a square billet in the usual way, preferably of uniform cross-sectional area throughout its length and wider than portions of the pass. Each shaft has flash on opposite sides, its varying width corresponding to the quantity of metal reduction. The description says that when the leader is of elongated form in one cross-sectional dimension, its major axis should be slightly larger than the largest cross-sectional dimension of the rolled blank. After the string is produced, the units are severed and the flash sheared off for finishing.

In patent No. 1,572,343, which, in the main, was designed to give correct dimensional spacings, broad reference was made to a so-called type of rudimentary leader; while here we are dealing with an improvement covering a special sort of leader, a rudimentary oval leader; round leaders being inferior and unsatisfactory. The patent was granted on a separate application to conform to the rules of the Patent Office, which prohibited claiming two species in the basic application.

The eleven claims are involved, but it will suffice to set out article claim 8, and process claim 10.

"8. As a new article of manufacture, a die-rolled blank adapted for torsional strains when subjected to rotation, the body of said blank being of substantially circular cross-section throughout the major portion of its length and having a changing cross-sectional area, the blank having longitudinal flash zones on its opposite sides for at least a portion of its length, the grain structure of the article near the periphery thereof being substantially uniform around the article, the line of the grains from the peripheral portions of the article toward the center thereof gradually merging into lines substantially parallel to the axis of the article, substantially as described."

"10. In the manufacture of bodies of different cross section and at least in part of substantially circular cross section, the steps consisting in forming a leader having a major axis and a minor axis with its major axis larger than the largest portion of the body to be finished therefrom, supplying the leader to a die rolling mill in such manner that the direction of compression of the leader in the mill is along a long cross sectional dimension of the leader, and die rolling the leader to form a series of similarly connected blanks, each of the several blanks having a varying cross sectional area along its length but of substantially circular section throughout a portion thereof, and then severing the blanks."

The new form of leader is of the essence of the invention. The disputes arise over the questions of lack of novelty and double patenting, in that the present invention is covered in the earlier, and is not distinguishable therefrom. There was rejection of broader claims filed than those finally allowed. An amendment relating to grain structure imparted from rolling the shaft was filed while the allowance of the patent, or some of its claims, was in abeyance. The amendment of new matter, in my opinion, does not enlarge the scope of the invention. There was no claim filed at the outset for improved grain structure, but, upon rolling the forms, their shapes were distorted, and there was added a claim to remedy the defect. This amendment does not, in my opinion, amount to taking an essential element of the first patent and including it in the patent subsequently granted, as was the case in Palmer Pneumatic Tire Co. v. Lozier (C. C. A.) 90 F. 733, or embodying an addition in violation of anything contained in section 4888 of the R. S. (35 USCA § 33). Indeed, the changes apparently gave a more complete explanation of the invention without enlarging its scope. Boyce v. Stewart-Warner, etc. (C. C. A.) 220 F. 124. The assertion that the described die rolls were taken from the prior Baehr patent of 1918 is likewise untenable, since the Baehr patent shows neither flash gutter, nor Witherow's method of die rolling, nor the production of a torsion shaft. In effect, the reference in the specification to Baehr simply states that the leader bar may be passed through the sectional rolls of a construction embodying certain features there disclosed.

All the involved claims are for a new combination, including the process of the earlier patent, and the addition of specific types of leader bars (Figs. 1, 2), ellipse or oval shapes, of uniform grain structure—the essential element of the combination. Oval leaders, it is true, were not new in the known art, but their use was restricted to parallel rolling; while in Witherow's torsion concept there are two kinds of oval leaders, each having "uniform cross-sectional area throughout their entire length," usable for rolling a plurality of rear axle shafts in strings with flash on opposite sides of each blank. The point is made that the art is not informed as to the particular kind of leader that should be used. But Engineer Sloane, when interrogated, aptly said that the skilled die roller would

know at once that he "must have a leader of suitable size to make his product." And, even though its suitable size is not indicated, the mechanic would know, from the figures in the drawing and the characteristics of the leader, which kind to use to achieve the purpose of the invention. His reply finds complete support in numerous patent adjudications. See, for example, Goodwin Film Co. v. Eastman Kodak Co. (C. C. A.) 213 F. 237. Moreover, in addition to the specific rudimentary leader from which the shafts were rolled, the description plainly instructs that the purpose of the leader is to form compact and advantageous grain structure for use in a new combination covering a new method of die rolling axle shafts. Much reliable testimony was adduced to show its superiority over rear axle shafts produced by old methods and processes.

It is also evidenced that a round leader is generally narrower than the grooves on the roll, while an oval leader is wider in parts than various portions of the groove, and in operation a round leader was objectionable owing to the formation of too much flash. The benefits, however, of the oval type resided in its reduction in width and height in the roll, together with a grain structure which definitely followed the contour of the article, eliminated distortion, and imparted a durability not inherent in forged axle shafts or in those made by the old Ajax method.

Prof. Sauveur, an eminent metallurgist, attributed great value to the patented structure, owing principally to the parallel run of the grain with the surface of the shaft; while Metallurgists McGee and Stewart swore that its use greatly decreased breakage from strains.

Expert Wadsworth alluded to the Lenz patent of 1912, as one of 21 exhibits in Exhibit List E submitted by him, wherein deformed articles were rolled with the object of securing improved grain structure, but his citations are not closely related to the present process. The torsional strains and stresses upon an automobile rear axle are widely different from those on a rolled tie plate, for example. It is emphasized in the patent that the feature of the grain structure resulting from use of the specific leader was not included or suggested in the earlier patent, and therefore the defense of double patenting, in my opinion, is not maintainable. The expert metallurgists were contradictory in their opinions as to the superiority of Witherow's axle over the Ajax axles.

Spears, metallurgist of the Chevrolet Motor Company, caused a comparative test of plaintiff's, defendant's and the Ajax shafts (12 in all) to be made, and concluded from the test that the Ajax shaft twisted more before breaking in the testing machine than the die-rolled shafts, and in his opinion the Ajax was superior. He admitted, however, on cross-examination, that he did not personally make the test, and was unaware of the origin of the samples tested, or whether the metal in the different shafts was of like analysis. In criticism of his experiment, plaintiff contends that in reality it shows that Witherow's shafts are structurally superior, since the amount of twisting at the yield point was greater than in the Ajax axles. Prof. Sauveur explained that in metallurgical engineering it is understood that the yield point in a torsional test is the chief element in ascertaining resistance, and that the yield point should never be exceeded or severely stressed to produce permanent deformation, since then the usefulness of the article for accurate testing ceases. The evidence in its entirety satisfies me that the test report relating to greater ductility and resistance to fatigue of the Ajax shafts was erroneous, and that the twist at the yield point of the die-rolled shafts used in the test was of superior quality.

Objection was also urged to the test of Prof. Menefee on the ground that it was secretly made without notice to plaintiffs and should therefore be disregarded. It appears that Chevrolet shafts and round machine bars were tested after die rolling them at defendant's plant, and that round bars were sent to the Chevrolet Company for testing with Ajax shafts. After subjecting them to heat, they were tested in the presence of defendant's witnesses Woods and Peterson. These tests are criticized, not only as having been made in plaintiff's absence, but also because the shafts were Brinnelled after separately heating them, thereby producing separate Brinnell hardnesses, and for failure to correctly caliper them. The Brinnell reading was embodied in a report, which, however, has not been exhibited. It was important to know, according to the evidence, before a correct conclusion could be formed by the testing metallurgists, whether the shafts had different Brinnell hardness, since they would have different torsional strength. It was therefore agreed by the parties that another test should be made, open to both sides, by Mr. Comstock whose report (plaintiff's Exhibit 128) corroboratively indicates that the Ajax shafts and machine shafts had a higher Brinnell hardness than the die-rolled articles. Notwithstanding the conceded verity of

the Comstock report, plaintiff contended that by the first test the shafts were treated to reduce the torsion by improper heating which tended to impart to the Ajax and machine shafts a better quality. To omit properly measuring the diameters of the shafts used for comparison, before heating them, was, no doubt, an oversight; but I think it tended to becloud and make uncertain the verity of the experiment. Upon this point, Prof. Sauveur gave cogent reasons for his conclusion that the reported tests are not entitled to probative weight. However that may be, the experts on both sides agree that laboratory tests must yield to experience resulting from real endurance and practical service of the article. The fact that motorcar makers no longer make their shafts by forging or machining, but instead approve and place reliance on Witherow's productions, is an impelling reason for ignoring the tests. It is next said that the Witherow shafts are susceptible to cracking along the flash lines, owing to the failure of the grain lines to accurately follow the contour of the shaft near the flash. These asserted structural defects, however, are not sufficiently proven, and, in my opinion, the evidence preponderatingly shows the utility of plaintiffs' rear axle shafts over prior structures.

There was testimony by two witnesses relating to prior uses of oval leaders in ordinary rolling of round bars and tie rods and in flattening operations, and it is argued that it did not involve invention to use an oval-shaped leader in the rolling operation in question. The testimony as to prior use, assuming that it bears upon the torsion structure, is believed insufficiently corroborated. In any event, it is not anticipatory of the plaintiffs' combination. The oval leader used in ordinary rolling had never before been included as an element in a combination for die rolling torsion rear axle shafts with flash. In this connection it should be remembered that the patent is particularly directed to axle shafts subjected to torsional strains and stresses, as distinguished from other articles, and that the leader has a major and minor axis, the former larger than the latter, for rolling a shape of varying cross section with flash along portions of its length. The combination of the steps and elements of claim 10, co-operating together, was new and effected a new and useful result.

Patents Nos. 1,502,705 and 1,570,660.

 These two patents concern the process already discussed, and relate specifically to length adjustments of die-rolled articles,

mainly axle blanks, having dimensional requirements—the first by temperature control of the billet and leader, and the second by speed control of the rolls in operation. Witherow testified that in the course of his operations, he ascertained that constant rolling roughened the rolls and interfered with proper dimensions of the article; that in the main the lengths were slightly but injuriously decreased, and did not accord with strict requirements; that he overcame these difficulties by changing the temperature of the leader bar and, when necessary, by controlling the speed of the matriced rolls. Coyle, an experienced roller, testified that these methods prolonged the use of the rolls and enabled keeping up almost steady rolling instead of ceasing work and replacing the roughened rolls by others; that in using temperature control it was only necessary to hold up the leader about 15 seconds so as to allow it to cool before it was again passed between the rolls.

To do this, in my opinion, was within the ordinary skill of a mechanic engaged in the art. Any difficulty arising from adjusting the length by halting the rolling to allow the leader to cool off, in view of the state of the art, was not of hard solution. In fact it was a resort to the common practice used in ordinary rolling to hold the bar awhile for cooling whenever it was observed that the length of an article was shortened, and, after cooling, to resume and get proper lengths. For getting a desired shorter blank, a leader of higher temperature was also generally used.

Claim 1 of patent No. 1,502,705 is explanatory and typical of the others. It reads as follows:

"The method of die-rolling blanks of predetermined length from leaders, comprising the step of passing a heated leader at a given temperature through a die-roll pass, and then die-rolling similar blanks from successive leaders by delivering such leaders to the die-rolls at a reduced temperature if longer blanks are desired."

Claim 2 relates to higher temperature for obtaining shorter blanks. I agree with defendant that the claims are merely for function or effect, due to varying the temperature of the leader. They were carefully considered at the outset by the Examiner, who rejected the claims on the ground that the patentee's observations in rolling blanks simply amounted to a discovery of effect and function which was evidenced in any ordinary die-rolling operation. Following the rejection, the patentee amended the specification by the following insert:

"In other words, the process is carried out by noting the temperature at which what might be called test leaders, are passed through the rolls, and such die-rolled blanks are then measured and the necessary corrections for length of the successive die-rolled blanks are then made by passing the leaders to the rolls at a lower temperature, than the above mentioned leaders, if longer blanks are desired or at a higher temperature if shorter blanks are desired."

The patent was then allowed, but to me this inclusion was not of controlling significance. It is clear that it was known in the art that the roll passes would become worn so that needed dimensions might not be produced, and steps in the way of cooling the leader bar to restore correct length, as already mentioned, were commonly understood. The evidence of Marquardt supports this view, in addition to the Stahl und Eisen article of October, 1903, and the Iron & Coal Trades Review of January, 1904 (Exhibits 3–J and 6–P), wherein analogous ways are shown for lengthening an article which previously had been too short.

What has been said also closely applies to patent No. 1,570,660, which, as I see it, does not claim any characteristic method of rolling with flash or with a rudimentary leader. The specification says that similar results are obtainable by varying the speed driven rolls, and "if the speed of the roll is increased, the amount of roll-slip is apparently increased, thereby resulting in the production of a shorter product." The description also states that, "as the percentage of reduction is increased, an increase in roll speed, either with or without an increase in temperature will produce a shorter blank than will be produced at the same temperature if the percent of reduction is decreased"; but, as no means are suggested for finding out the extent of variation in lengths that may result from changes in roll speed, there was an obvious indefiniteness which persuasively indicates that the speed variation by way of reduction or acceleration is simply dependent upon the observation of the roller. The Patent Office Examiner at the outstart rejected the claims, saying:

"These patents have an inherent right to drive their die-rolls either fast or slow, or to vary the speed at any time during the rolling process, and it is inconceivable that this varying of the speed has not been done. * * * The applicant has merely discovered this law which is inherent to the mere act of speeding up or slowing down of the rolling devices."

The prior publications indicate that, before Witherow's concept, it had been observed in die rolling that when, from wear on the rolls, they tended to lessen the length of the article or blank, water or draft [sic] would lower the temperature of the rolls, thus imparting more extrusion. The prior publication by Puppe emphasizes the effect of extrusion in a die-rolling operation by what he calls "hurrying ahead" of the metal in advance of the revolutions of the rolls at the point where the article leaves the pass, and he asserts that the extrusion is affected by changes in roll diameter or changes in draft, or percentage of reduction in the vertical direction of pressure. Expert Wadsworth, testifying for defendant, also points out that in the Iron Age and the Iron and Coal Trades Review, a reproduction of the German article, it is said:

"The extrusion effect increased as the temperature of the rolled material decreased— that is, with a lowering of temperature of the leader bar, the increase in the length of the rolled section, corresponding to a given length of matrix, is greater than it was before, and that the reverse effect is obtained when the temperature is increased."

Upon citing Bullock, etc., v. Croker, etc. (C. C.) 141 F. 101, a decision involving the method of changing the speed of an electric motor, and a second argument, the Examiner allowed the patent. To me it is quite believable that a method for varying speed of an electric motor might involve invention, while varying speed of a rolling machine to attain a result would simply involve the ordinary skill of the mechanic. Hence I find that the process attains functions which are incidental to the die-rolling operator, and its successful operation was within the skill of the mechanic. Hence both patents are deemed invalid.

### Patent No. 1,516,069.

In this patent, Witherow, to eliminate circumferential displacement of rolls, upper and lower, during operation, or from either wear or different machining of one of the rolls, places indicia, or measuring marks, upon the definitely formed flash of the rolled blank. By such means it became easy to measure or gauge lengths and tolerances and designated cross sections after the blanks have been rolled. The marks were also informing as to which roll impressed a certain side of the blank and whether micrometer adjustment was necessary. It was conceded that indicia marks or punch marks of various kinds, formed on rolled articles singly or in

strings, is a very old expedient—one that had been in use long before the invention in suit. It is claimed, however, that putting indicia marks on flash was new and novel. Defendant emphasizes the Cramer patent, No. 502,280, for rolling soldering irons, as showing flash at J–I, Fig. 3; but, as I see it, the excess metal there did not constitute flash for measuring lengths. However, Cross-Exhibit D rolled in Baehr rolls (patent to Baehr, No. 1,289,602) has indicia marks on flash; while the patent to Rogers has "creasers" in the matrices used to form indicia markings at different lengths on the blank to indicate the point of severance. These prior art disclosures were sufficiently informative to enable the skilled metal roller and draftsman of shop plans to make indicia marks on the flash of plaintiffs' product for measuring lengths without resorting to invention. The patent is therefore invalid.

### Patent No. 1,600,782.

This patent, called antero-posterior, relates to the manner in which the matrices on the die rolls are grooved to provide for definite and essential flash to produce the forms. In parallel rolling and roll flattening, the roll pass of the metal leader is given sufficient space to allow for the lateral spread of the excess metal, but sometimes the direction of the extrusion is also lengthwise, which results in lengthening the blank and manifestly interferes with rigid dimensional requirements. To overcome the extrusion obstacle was a perplexing problem, owing primarily to tapered lengths in varying portions of the article. Changes in matrices by renewed cutting, etching, or graving was of course possible, but it would have been expensive to do this. There existed a need to design the initial rolls in such a way as to meet the customer's orders, and particularly for continuous rolling to produce tonnage. This was unattainable, as the proof shows, even with shrinkage allowance, by cutting the peripheral rolls to the exact size of the blank. In the experiments, the blanks showed up shorter in parts than the matriced form, when in fact the metal should have spread to make it somewhat longer. Each trial or test failed to give the dimensions of the shop blueprints; but the patentee resolutely continued to get accurately designed rolls, and finally it dawned on him that, in rolling strings, the preceding unit or section affected the succeeding one. He then realized the necessity of providing for what is technically known as rolling on, rolling off, or rolling straight, as applied to dimensional variations. New designs, compensating for the ahead section, were carefully prepared by engineers, and both Prof. Trinks and Expert Wadsworth said they had never before Witherow heard "that in rolling an article of varying cross section, the preceding section affected the action of the succeeding section." The asserted advance in Witherow process therefore cannot be treated lightly, for, without accurately grooving the rolls, satisfactory results were unattainable.

The defendant, however, urges invalidity on the ground that the claims are broader than the disclosure; that they are vague, indefinite, and inconsistent in description, were in public use at Witherow's plant more than two years before the application was filed; that Witherow was not the inventor; that the result was functional; and also that the disclosure of accurate length control is included in Witherow's first patent. These various defenses, for reasons hereinafter stated, are not thought maintainable.

The introductory of the specification states:

"I have found that the elongation produced by any particular section of a pair of die rolls, while it varies generally with the percentage of reduction from the leader, will also vary in accordance with the dimensions of a preceding section, particularly if there is a considerable difference in area between such sections."

It is then stated that the patentee found out that the faulty variations in portions were due to lack of compensation for the action of the rolls on the leader bar, and, though the ordinary ratio of its length to the rolled article varied with the rate of cross-sectional area, yet this would not strictly apply where sudden changes in sections were encountered. It further stated:

"Seemingly the metal 'piles up' prior to entering the rolls, so that considering only the portion of the leader immediately adjacent the rolls, the finished article is virtually being produced from a leader of greater cross sectional area than the leader which was furnished to the mill."

To produce a symmetrical front axle blank with ends of the same dimensions on passing through the rolls, the form of the matrices of necessity must be materially different in their dimensions. The specification continues:

"I have found that when a section of a certain size is followed by a section of larger size it is necessary, if accurate results are to be produced, to shorten the matrix portion which is to produce this larger section. Oth-

erwise, the roll portion will be longer than the calculated size. When conditions are reversed, the action of the preceding section on the succeeding section is also reversed. That is to say, if after rolling a larger section we come to a smaller section, the calculated length of the roll matrix portion of such smaller section should be somewhat increased."

The term "calculated length" of the roll matrix, according to the expert evidence, implies the necessity of cutting the grooves for correct lengths by equalizing the different grooved portions to the particular grooved part preceding it. The steps of the process comprise the two rolls, a suitable leader, and estimating the various parts of the matrices in view of the sectional reduction. The description as to this says:

"In this particular case, the article to be produced is antero-posterially symmetrical, and if the matrix portions were calculated solely by taking into account the percentage of reduction from the original area of the leader, the roll layout would also be symmetrical."

Explanatory reference is then made to the drawings, Figs. 1, 2, 3.

Claims 2 and 10, relating to process and articles, are typical and read as follows:

"2. In the method of making die rolls, the steps consisting in varying the dimensions of a roll matrix portion to compensate for the change in *extrusion* effect due to the difference in cross section or shape between a portion preceding the portion in question during the rolling operation, and the portion in question."

"10. As an article of manufacture, a die roll for the production of antero-posterially symmetrical articles, said roll having unsymmetrical matrix portions, said matrix portions varying from one another to compensate for the change in extrusion effect due to the difference in cross section or shape between portions preceding the portions in question during the rolling operations."

Claims 5, 6, and 7 are apparently restricted to rolling front axle blanks, while claim 11 specifically deals with the article in varying cross section and irregular shape.

The Kirschberg and Puppe publications in Stahl und Eisen, February 3, 1903, and October 15, 1903, stressed by defendant, are not anticipatory, since the reference relates to parallel rolling, which presented the problem, the patent declares, so difficult to overcome. Prof. Trinks agreed that, in rolling irregular blanks, the flow of the metal was the principal cause of the obstacle, and plaintiffs' engineer, Sloane, testified that the Kirschberg-Puppe formula was tested by him and proved inapplicable to the process. It is undisputed that in rolling a form of varying cross section, the preceding section affects the action of the succeeding section, and that this was known in ordinary rolling.

There is no fatal contradiction in the wording of the patent, as defendant contends, for, after all, its teachings are addressed to the skilled in the art, and, without a more specific formula or calculation of matrix length than that contained in the description, the skilled designer of the rolls, upon reading it and having in mind the particular object and the attainable result, could, no doubt, have made the proper calculations without much difficulty. Minerals Separation, Limited, v. Hyde, 242 U. S. 261, 37 S. Ct. 82, 61 L. Ed. 286; Goodwin Film Co. v. Eastman (C. C. A.) 213 F. at page 237. Examples with apparent exact dimensions, both as to articles and grooved parts, are found in the specification (page 2), together with drawings to aid in making calculations as to size of the leader or matrix dimensions. The fact that several tests or trials were necessary before reaching accomplishment, standing alone, would not condemn the disclosure for indefiniteness or impracticability; for, in determining sufficiency of a disclosure in a patent, the old art in relation to a new method must be considered. A. B. Dick Co. v. Barnett (C. C. A.) 288 F. 799.

The evidence relating to prior use I find unconvincing. The Du Barry note book does not show a complete, successful rolling of axle blanks at plaintiff's plant or elsewhere. The memoranda related, it is fairly inferable, to experimental rolling and the detailed results. The three-line extrusion and contrusion charts (Exhibits 19, 20, 21) were prepared late in 1922, while the application for patent was filed February 29, 1924, within the two-year period for filing application for patent. That it was Witherow who invented the improvement is fully evidenced by Sloane, who testified that upon Witherow's suggestion and request the charts were made, taking for a basis the effect of rolling a preceding section and making provision in the grooving for the varying dimensions. That the presumption of validity extends to the identity of the inventor, as indicated by his oath that he discovered the invention, is fairly well settled. It will suffice to cite on this point Procter & Gamble v. Berlin Mills Co. (C. C. A.) 256 F. 27.

It is true that the first patent, No. 1,572,-343, includes the purpose and object of

length control and steadiness by the use of flash on opposite sides of the blank, but this does not mitigate against devising additional patentable means to improve the article or facilitate production. The earlier adaptation was not perfect, though it permitted elimination of lack of uniformity in length and enabled rolling with tolerances; but, like nearly all primary inventions, it developed faults and crudenesses which a later invention might improve. See Hildreth v. Mastoras, 257 U. S. 27, 42 S. Ct. 20, 66 L. Ed. 112.

[15-17] The combined steps of the improved process consisted in varying the dimensions of the matrix portion to compensate for the extrusion effect, to which reference has been made, and by which a varying matrix blank was produced, resulting in a similar article to the matrix form, though concededly differing from the exact matrix form or portions. It was not a mere cutting of the grooves and necessary testing, for compensation for varying cross sections was the essential to complete success. To do this successfully was to step forward over the primary patent, in that better blanks were obtained. The patent, I think, is deserving of more than ordinary merit, since it was first necessary to find out the difficulty in the earlier method, and then discover means and steps to overcome it. In so attempting, old practices were pushed aside and new ideas developed which eventuated in practicality and great usefullness. The claims containing the step or steps are, in my view, entitled to a liberal construction so as to afford plaintiff full protection from evasive or equivalent adaptations and productions. The contention that the claims covered more than was actually discovered, or cover features of the old art, or merely cover the results of operation, finds no support in the evidence. The real invention includes a new method of die rolling irregular shaped forms of varying portions in length, and constituted a simpler way to groove the matrix. The step or steps are intricate and even somewhat vague to the layman; yet the general terms of the description, I am convinced, would not confuse the skilled engineer. In any event, general descriptive terms do not invalidate a patent where they are sufficient to enable the skilled in the art to apply the invention. Eibel Process Co. v. Minnesota, etc., 261 U. S. 45, 43 S. Ct. 322, 67 L. Ed. 523. It was not a matter of covering all means for producing axle blanks by die rolling, for another principle, based on other ways and means, would be patentable, even though the same effect is attained. Ries v.

Barth (C. C. A.) 136. F. 850. A functional result in the abstract has no relation to the concept, and, true enough, would not constitute invention, but the mode of applying the principle for producing a certain result, if ascertained to be new and useful—let it be a machine or a process—comes within the purview of the patent law, and is entitled to protection.

Counsel argues strongly that the claims are not for a method of treatment, but simply consist of a system of varying the dimensions or varying the ratio of length by cutting the matrix grooves or cutting down a particular form of groove, and he says that, even though calculation by the designer contributed to greater accuracy in attaining the effective use of the rolls, the achievement was not patentable. With this view I am not in accord, for, as said before, the claims particularly describe a mode of treatment, to wit, a plain way of graving the roll periphery to compensate for the ahead section in the operation of the articles and to cause the rolls to perform a new and beneficial result—one fairly distinguished from function or effect. Corning v. Burden, 15 How. 252, 14 L. Ed. 683. It was the solution of a problem which mere mechanical skill could not have solved. That the rolls and mills or machinery aiding the die-rolling operation were old is of no importance, for, as said in Cochrane v. Deener, 94 U. S. 780, 24 L. Ed. 139:

"The process requires that certain things should be done with certain substances, and in a certain order; but the tools to be used in doing this may be of secondary consequence."

### Patent No. 1,607,498.

This patent, used in connection with Witherow's rolling operations, refers particularly to roll grooves or matrices becoming roughened and worn in use to such an extent that they affected the length of the articles; the roughening mostly occurring at the greatest reductions of the leader, or where the section is very narrow. It was old to smooth worn or uneven rolls in ordinary rolling. In die rolling axle forms, however, by Witherow's method, it became necessary to cease operations and take out the rolls from the mill for polishing the matrices. By the invention, the polishing is done in much less time than by any earlier methods. The rolls continue in the mill during the polishing, thereby saving expense and delay, while the article suffers no change in dimensions. All the claims are involved, but claim 2 is typical of the others.

"2. In the method of die rolling, the steps

consisting in passing leaders between normally rotating die rolls having matrix portions which vary in cross-sectional size or shape to produce a plurality of articles which are of different cross-sectional size or shape at different points, continuing the operation until the rolls have become roughened at the matrix portions thereof, stopping the rotation of the rolls and polishing the roughened portions of the rolls by guiding a polishing tool over such roughened portions while the rolls are inoperative."

The defenses are prior use and noninfringement. The witnesses Coyle, Earnest, and Marquardt, all skilled rollers, say that it was very old to polish rolls and grooves when roughened in operation. Marquardt testified that in polishing grooves of uniform shape, the common practice was to use an emery stone and hold it in a pair of tongs, pressing it against the rolls as they rotated, but, in polishing grooves of varying contour, a power-driven tool, guided by hand, was used when the rolls were not rotating, and he added that it was impossible to polish rear axle shafts, or a roll like Exhibit 16 by the old method or emerying while the roll revolved. Roller Earnest, for defendant, testified that, in reclaiming the rolls, a polishing tool is used at defendant's plant, having a portable motor, flexible shaft, and a grinding wheel at the end; and that the mill is shut down while the tool is guided over the matrix surface.

The sole question seems to be whether the process of polishing die cavities for rolling complex articles, especially axle blanks, with a portable grinder, after shutting down the mill, the rolls remaining in place, involves invention or nothing more than mechanical skill.

It would not involve invention to merely adapt a power-driven polishing tool to the matrices, but using such instrumentality in combination with Witherow's new method of rolling, together with the manner in which the polishing occurred and its result in restoring lengths, constituted a co-operating step in the process. A similar situation was presented in Consolidated Window Glass Co. v. Window, etc., Co. (C. C. A.) 261 F. at page 369, and Okmulgee Window Glass Co. v. Window Glass Mach. Co. (C. C. A.) 265 F. 626, wherein it was held that each element or invention that contributes to the successful end is not an isolated inventive act, but should be regarded as an additional step with interrelated parts and combination as a whole.

Upon the subject of alleged prior use, Mason swore that, while he was employed at the Witherow plant, the die rolls were re-dressed by polishing with a power-driven tool, and it is argued that this was done more than two years before the application for patent was filed. Coyle, however, swore that such polishing did not begin until August, 1923, within the two-year period.

I conclude that the evidence relating to the earlier use is not sufficiently established. In view of the proven value of the invention as an added step in Witherow's process, the claims in controversy, when limited to polishing the specific matrix rolls having varying cross-sectional shapes and adapted to producing shapes and axle forms in strings, were not invalid or anticipated.

### Patent No. 1,607,445.

The proofs show that, in die rolling articles having lateral flash, a sharp corner, which was common in roll construction, left between the matrix part and the roll surface, causes a more rapid deterioration of the matrix than when the corner is broken to produce a fillet at the junction of the article and the flash. The patent provides for such a fillet, and it is claimed that prior to the invention, in trimming off the flash, furrows were left along the flash line and the blanks were rejected as defective and commercially unsuitable. This condition, it was ascertained by Coyle, was caused by a caving-in of the grooves occurring at the corners of the matrices, and, to overcome the difficulty, he blunted or broke down the corners to produce a small fillet, leaving the flash, however, for cutting off. In this manner he eliminated the objectionable furrows and interference with the evenness of the grooves, increasing production and improving the article. Claim 1 is typical of the method. Claims 4 and 6 are for the article.

"1. The method of die rolling which includes forming a die rolled blank having integral flash portions, said flash portions forming no part of the finished article, there being a fillet at the junction of the article and the flash, and separating the flash from the article at the fillet."

"4. As a new article of manufacture, a pair of die rolls having matrix portions terminating in the roll peripheries, such matrix portions being adapted to form a die rolled article when a leader is passed between them, the peripheral portions of the rolls adjacent said matrices being adapted to form a flash which is ultimately to be severed from the article formed in the matrices, the corner formed at the junction of a matrix portion and the adjacent peripheral surface of the roll being blunted."

"6. As a new article of manufacture, a

die rolled blank having an integral flash adapted to be severed from the finished article, the flash being connected to the article proper by a fillet."

The defenses are noninvention, prior use, that claim 1 is for the result and also fails to distinguish from the prior art.

The defense of prior use is based, in the main, upon the uncorroborated testimony of defendant's witnesses Mason and Morris, to the effect that the roll grooves were rounded or broken down at plaintiff's plant more than two years before the filing date of the application; but these assertions are disputed by Coyle, who swore that rounding the corners, or blunting them, was not begun at plaintiff's plant until the latter part of 1923. There is other testimony tending to negative defendant's version, which, however, need not be detailed, inasmuch as defendant's narratives are uncorroborated and unconvincing.

It is proven that upon die rolling a few hours, prior to the invention, the roll grooves would break down, and for about a year and a half at plaintiff's mills the corners were rounded by grinding. It was a common thing in the art to break down or round the corners of the groove to remove sharp edges, but deliberately blunting them or removing a small quantity of metal at the corner to produce a fillet between the flash and blank was a new adaptation. Did it constitute invention to do this? There concededly was a difference between rounding the groove corners in parallel rolling and blunting or breaking them down to improve the usefulness of the rolls in Witherow's process. In the known method, no filleting or shaping effect was produced on the blank.

The Patent Office twice rejected the claims on the ground that it did not involve invention to taper off the edges of the groove or die cavities, and cited the Witherow patent, No. 1,516,069, and patents to Refior and Free. In both Witherow and Refior the claims are not met, for in each a sharp-cornered matrix is shown; while in Free the article, instead of showing flash, has ribs which are rolled into the article, and the matrix portion of the roll is beveled or chamfered but does not form fillet. A supplementary oath was filed by the patentee, stating that the subject-matter of his invention was new, but the Examiner again rejected the claims, citing the patent to Mannesmann, No. 721,-212, stating that it showed a fillet on flash which was to be removed. Upon subsequent representation that both Free and Mannesmann showed ribs for rolling back into the article, and that flash was of the essence of

the invention in rolling the axle blank, the patent was allowed. Sketches from the Brovot book (Defendant Exhibit 3–N, 3–N–1) show round corners in parallel rolling, but it was not done for shaping the rounded portion of the article. Prof. Trinks concedes that the finishing pass in ordinary rolling eases away portions at certain points between the roll and the leader, and says that "under normal conditions only when the leader is a little too large on account of cold steel" is there any shaping influence or indication; while witness Schreck (who has had a longer experience in designing rolling mills) asserts that in parallel rolling the round corners of the passes shown in the Brovot exhibit have normally no shaping effect on the article. The publication, "The Making, Shaping and Treating of Steel," to which expert Wadsworth referred, shows a fillet from rounding the corners, but in the Coyle patent the object in blunting corners, as above stated, was to get a fillet between the article and the flash to prevent objectionable furrows and thereby prolong the use of the rolls. True enough, it was a minor invention, but it overcame the encountered difficulty of deteriorating the rolls. It was an additional step in the Witherow rolling process, and, in my opinion, is entitled to consideration as a combination of the various elements or steps in the process heretofore discussed. The principle of the Consolidated Window Glass Case (C. C. A.) 261 F. 362, has application, wherein the Circuit Court of Appeals for the Third Circuit substantially ruled, in considering the patents there involved, that each feature or factor involved in the continuous process was so interrelated that every element contributing to the successful end "cannot be considered as an isolated inventive act, but must be viewed from the standpoint of all the parts of the interrelated, correlated, combination whole." The claims, therefore, were not merely functional, and the alterations from the prior adaptations involved patentability.

### Patent No. 1,597,955.

The specification substantially states that in die rolling articles, wherein the rolls have matrix portions and wherein there is heavy reduction of material, the rolled metal at the corner of the matrix portion of the roll, upon contacting with the hot metal, often becomes pitted or cracked, with the result that the roll becomes useless for continued production. The proofs show that regrinding the impaired parts does not restore the rolls for satisfactory rolling of axle blanks, although usable after treatment for rolling

smaller articles. In this situation, Coyle, an employee of Witherow, slightly reduced the diameter of a used roll by lathing or working out the matrix portion to the initial depth of the groove. Such a procedure shortened the matrix cavities a little and lessened the diameter of the roll—a variance that was offset by an enlarged extrusion effect, an effect that was obtainable only by the adaptation of Witherow's rolling process. For the sake of clarity, the specification may be quoted:

"I provide for reducing the diameter of a used roll slightly and working out the matrix portion to substantially its original depth. For example, a roll for the production of a rear axle shaft for automobiles may have a matrix portion which in some instances is nearly an inch deep. When a roll of this character has been worn out it is placed in a lathe and reduced in diameter from ⅛ to ³⁄₁₆ inches and the matrix portions are recut to substantially their original depth.

"It will be appreciated that during this process the matrix portions will be reduced somewhat in their length. * * * "

In redressing the die rolls, according to the patent, it was possible to produce articles of nearly the same length as were produced by a new roll, and the roll could be redressed and utilized five or six times after lengthening the matrix portions. Indeed, more articles were produced by redressed rolls than by a new set. It appears that thirty or forty thousand rear axle shafts were rollable by a pair of new rolls, while after redressing and polishing, forty-five to fifty thousand were obtainable. The increase was attributed by Coyle to the slight reduction of the diameter of the rolls and the compression of the hot metal on the roll material which increased its density. It also appears that the cost of a new set of rolls was about $500, while to reclaim them, after attrition, was approximately $75. Witherow swore that this adaptation not only largely reduced the expense of roll cost, but added to the utility of the rolls.

There are seven claims, and all are involved. Claims 3 and 6, typical of the others, read as follows:

"3. The method of die rolling, which includes reducing the diameter of a roll, and utilizing the increased extrusion effect of the smaller roll thus produced to secure die rolled articles of substantially the length produced by the original roll, substantially as described."

"6. The method of using a die roll having matrix portions therein connected by a gating, which includes reducing the diameter of the roll after it has been used, deepening the matrix portions, and encroaching upon the gating to secure the desired length for the matrix portions, substantially as described."

Concededly it was an old practice in the rolling art to dress and redress the die-rolls which became worn or roughened, due, no doubt, to the flow of flash. Plaintiff at the hearing offered in evidence a disclaimer, after defendant had begun its defense, and defendant's counsel, in opposition to receiving it, argued that the disclaimer constituted in effect a reissue and material alteration of the scope of the claims. The disclaimer, however, aims to limit claim 6 to instances where the matrix portions of the die rolls are proportioned for squeezing out flash on both sides of the blank during the rolling operation.

The principal question is whether claim 6 is narrowed by the disclaimer to overcome defendant's showing of prior use. The disclaimer, in my opinion, is not invalid, even though the term, "flash located alongside a portion of the article," was introduced into claim 6. The case is similar to Permutit Co. v. Harvey Laundry Co. (C. C. A.) 279 F. at page 721. In that case the disclaimer excluded from the scope of the claim in issue the casing in which the water to be softened passed up through a layer of zeolite, and it was ruled that there was a patentable distinction between the down-flow and the up-flow of the water running into the casing for regeneration of the zeolites, since the former worked satisfactorily while there was doubt about the latter. Judge Manton, writing the opinion for the Circuit Court of Appeals, agreed with the lower court that by the disclaimer nothing was injected into the patent, the action having been simply for the purpose of limiting its effect, and said that, as "the power to disclaim is a beneficial one, it should not be denied, except where a fraudulent and deceptive purpose is apparent." This view as also adopted by the Circuit Court of Appeals for the Sixth Circuit, in Permutit Co. v. Wadham, 13 F.(2d) 454.

There is nothing here to indicate that new matter was added to the patent or that the disclaimer broadened the claim or that it was filed for a fraudulent or deceptive purpose, since the specification, drawings, and claims clearly relate to rolling rear axle shafts by the Witherow process as described in the torsion patent No. 1,577,430, a process for die rolling the articles with intentional flash. The experienced engineer, on reading the Coyle patent and

glancing at the drawing, would intuitively have become aware that the improvement in cutting the matrix portions contemplated the rolling of an article with flash at opposite sides. See, also, Manhatton Gen. Const. Co. v. Helios-Upton, 135 F. 785 (C. C.).

The redressing of rolls by the Cleveland Hardware Company and the Scranton Bolt & Nut Company were not prior uses applicable to the present invention. The testimony related mostly to roll-flattening operations or parallel rolling, wherein the articles were not of rigid lengths or tolerances or needed no reduction of diameter to produce tapering, or wherein the effect of greater extrusion of the smaller roll was used to compensate for the shortened matrix so as to get the same length as by the initial roll. It was admittedly old to dress down worn-out rolls to be again used for giving correct grooves and sizes, either plain or matrix grooves, but none of the prior publications or patents suggest any definite bearing upon the greater "extrusion effect produced by the smaller roll." Prof. Trinks testified on this point that in either plain or matrix grooving material must be taken from the bottom of the groove, the circumference being smaller, and he cited metallurgical literature and books to substantiate his view; but subsequently he admitted that the extrusion effect from use of a smaller roll, in prior redressing, has never been such as to restore the original length of the article. From this qualification it is fair to infer that his citation did not strictly apply to the present invention, wherein, as is manifested throughout the patent, the aim was to secure exact lengths without which the blank in most instances was defective. There was much testimony bearing upon this point, but the salient portions are persuasive of the inventor's claim that by practicing his method of redressing, namely, by deepening the original groove without materially increasing its length, and wherein the effect of extrusion of the smaller roll was relied on to maintain the desired length, was a new and novel expedient, and one that involved inventive skill.

The disclaimer, as limited, is not invalid, and I find that the testimony relating to prior use of the Coyle adaptation was inapplicable and insufficient to anticipate.

### Patent No. 1,609,045.

The final patent to be considered is for cutting the circular roll matrices or cavities for shaping an article of rounded cross section, especially as required for die rolling rear axle shafts. The problem was to groove the rolls with scientific accuracy so as to produce rear axles of varying circular cross section. It was difficult, according to the specification, to rightly cut the varying matrix parts because of differing lengths at the bottom of the groove. In the known, ordinary rolling, the rolls were of solid metal, as distinguished from earlier types which were segmental parts fitted together. The latter were unsatisfactory for Witherow's die-rolling operations, while the ordinary rolls necessitated cutting the solid rolls with a rotating tool, or so-called fly-cutter, to cut away a groove partly formed on the roll surface, as shown by drawing Fig. 6 of the patent. To get the desired contour of the shaft, it was necessary to enlarge and deepen the groove by cutting or scraping along the sides to alter the cross section. It was necessary for a workman to lightly and intermittently tap the cutting tool, held in place by a set screw, with a hammer, to continue changing its position, especially for varying thicknesses in the supporting bar, to complete the matrices. By this method proper tapering length of the shaft was obtained, but the blank lacked roundness. Instead of being completely round, it was oval-shaped and objectionable. Langston, sales manager of plaintiff, swore that approximately 15 per cent. of Witherow's die-rolled axle shafts were rejected owing to irregularity in rounding. Other groove-cutting methods were tried without improvement. It was then suspected by the inventor that the defect was attributable to roll-spring, and, upon spacing the rolls apart, or by roll-set, to allow the flash on the sides of the shape to spread sidewise, a proper rounding in cross section might be had. Roll-set, however, did not estop roll-spring or attain true rounding. Expert Sessions testified that in order to produce intentional flash, the rolls had to be open before inserting the leader, and in operation, when reaching a thinner section of the leader, the rolls sprang apart. Therefore it was essential that provision be made for flash in the grooves, and also allowance or compensation for the roll-spring to secure true rounding. The specification clearly informs how the compensation or allowance for roll-spring is made in the cutting of the roll matrix. It says:

"When a section of small diameter is being rolled the reduction is greater than if a larger section is being rolled from the same leader and there is a change in the

amount of spring in the roll. If this were not compensated for it would result in the production of a bar which is *slightly elliptical at certain points instead of being truly circular*. This can be compensated for very readily by my method by raising or lowering the milling machine table so as to vary the distance of the cutter axis from the blank in accordance with the size of the section. This results in a slightly shallower or slightly deeper groove being cut at certain points, and as a result of this the spring of the mill is compensated for and truly circular sections are produced."

Even with side flash, the rolls parted, and varying compensation was necessary, owing to the difference in reduction at various parts along the tapered length of the blank. Such a situation was not presented in ordinary rolling operations. It was not an obvious thing to do. It was a new and progressive adaptation in Witherow's process to use the fly-cutter for cutting matrix grooves, together with new means for affording compensation for roll-spring. No prior patents are submitted containing any suggestion as to accuracy in cutting matrix grooves or other articles having a different cross section in circular portions. The Farrington patent does not disclose the method with which we are dealing, nor is it suggestive of the means for tapping of the tool or making allowances for roll-spring.

Claim 1 is representative of all six, and reads:

"1. The method of making die rolls for articles of *varying circular cross section*, which includes rotating a cutter about an axis occupying substantially the same relation to the roll blank as the axis of a bar in the mill will occupy with respect to the finished roll, the cutter being capable of lateral movement with respect to its axis of rotation, causing relative rotation of the blank with respect to the axis of the cutter and varying the radial length of the cutter by tapping the cutting tool."

Claim 2 is limited by the term, "producing an increased resistance to the displacement of the cutter on tapping thereof," while the others recite the steps in greater detail, but in effect are the same as claim 1.

Aside from denying infringement, defendant insists that Witherow's patent, No. 1,572,343, was partly allowed on the asserted elimination of roll-spring over the Richardson and Baehr patents; and further that compensation for roll-spring had been made in fly-cutting operations at plaintiff's plant by its predecessor as early as 1921 or 1922.

I find nothing in the testimony of Odwalt, Du Barry, or Morris to satisfactorily prove that roll-spring was compensated for at the plant more than two years before the application herein was filed. Indeed, there is much testimony to the contrary and to the effect that complete success in rounding the shaft was not achieved until later, when means for allowance for roll-spring was discovered, which was clearly within the two-year limitation. The testimony as to prior use is not anticipatory. Nor is there controlling point to the suggestion that the first patent aimed to eliminate roll-spring by using flash or flash gutters. I discover no such inconsistency in the two patents as to defeat the latter. The initial patent evidently did not succeed in allaying roll-spring or in getting true rounded shafts, and hence the present patent in its described use of a fly-cutter to compensate for roll-spring may be classed as a progressive growth in the Witherow process.

## As to Infringement of Patent No. 1,572,343.

[23] Having decided that Witherow was the first to successfully devise means for die rolling a certain class of articles in a new and definite way, and adapt a series of coacting steps in a new combination, and that by his later improvements he advanced the rolling art, it must seem obvious that the various claims in controversy should be accorded a fairly liberal scope to the end that users of the inventions, without license, be held accountable for infringements, regardless of any minor deviations in practice or achievement. It will not be necessary to follow with great care the detailed descriptions of the asserted noninfringing features in defendant's process, for infringement, in my opinion, does not depend upon the identical means for accomplishing the end. Defendant in its rolling operations adopts all the essential steps of the claims of the initial patent. It runs its rolling mill to fabricate ferrous axle blanks in the form of strings for later severance into singles in substantially the same way as Witherow. For making front axles, it uses a leader bar reduced in length in its hot state for insertion in the roll pass. The rolled blank, with excess metal on opposite sides varying in width, flows freely in the same median plane as in plaintiff's string. After rolling a string of blanks, defendant cuts the string into singles which are conditioned for reworking or reforging parts, while portions of the blanks are finished with dimensions and

tolerances as in the patented process. The rear axle blanks are rolled with flash zones on opposite sides, and, on cutting the string into separate blanks, they are in condition for reworking and machining to obtain correct dimensions. Claim 4. The wheel end and spline end of the shaft are also fitted for reworking, while each shaft has other portions of substantially finished dimensions and contour (claim 5), and is held at the ends to the adjacent shape by a so-called gating (7), the point of separation. Defendant's waste metal to connect a series of blanks is the equivalent of the gating. Although defendant's forms are not reheated for forging, they are nevertheless suitably rolled and prepared for doing so by the customer to whom defendant's deliveries were made. Since it was the intent that the customer should perform subsequent operations to complete the article, defendant is not relieved from infringement. Defendant strongly maintains that because it does not use flash formed in a flash gutter for eliminating roll-spring, as mentioned in the specification, it cannot be held to infringe the claims including flash as an element, since such claims must be limited thereto. And in argument it is said that the excess metal on its product is not intentional flash within the terms of the patent, but merely constitutes an old-type overfill which is entirely attributable to the rolls being set slightly apart from one another. The reference to flash gutters in the rolls, however, is insufficient reason for limiting the claims to such means, for the involved claims clearly state that excess metal should be permitted to flow sidewise in an unrestrained manner to form flash integral with the blank. They do not contain the element of flash gutters. Defendant in its rolling produces flash in a substantially similar way, and for the like purpose, and thereby maintains the required length. By the patented process, the flash flows freely and the rolls are set or arranged to that end. Patents of the prior art in operation, as heretofore stated, banned the unrestrained flow of metal and adjusted the rolls for its elimination. Expert Sessions observed defendant's operations at its plant in the rolling of rear axle shafts, and says that the process used is accurately described in patent 1,572,343; and that the die rolls inspected by him for producing front axle blanks also respond to the description. Prof. Trinks in his testimony, however, described the rolls of defendant as set apart similar to ordinary rolling without flash gutters to lessen the roll-spring, and without the use of a rudimentary leader; while Sloane, in opposition, swore that defendant used a rudimentary leader of I-beam shape, a form illustrated in the patent. In Wadsworth's opinion, the flash did not affect the length or control of the article, and he reasoned that a change in the resistance opposing the formation of the article by the presence of flash at portions outside the matrix groove rendered such effect extremely uncertain. But Expert Sessions expressed a contrary opinion, averring that flash aided in control of length and size and stabilized the series or string. The views expressed by him, considered in connection with other features of the first patent and its accomplishment, are, I think, of more weight and significance; and hence I find that defendant, in its operation of die rolling front and rear axle blanks, has appropriated plaintiff's process.

It will suffice, I think, to consider the asserted infringement of the torsion patent in connection with example claims 8 and 10. The grain structure of defendant's die-rolled rear axle shaft substantially accords, I find, with plaintiff's. It is substantially uniform and of circular cross section with varying cross-sectional area, and with flash on opposite sides for a part of its length, which, upon severing, leaves a flash zone that is fairly responsive to claim 8. In defendant's product, as in plaintiff's the grain structure near the surface is nearly uniform in round, while the run of the grain from the surface toward the middle merges into lines substantially parallel to its axis. In defendant's die rolling it uses (1) a leader having a major and minor axis, the former larger than the finished body; (2) it passes the leader to the mill in the manner specified in claim 10; and (3) die rolls it to produce like blanks in series connected together at their ends, the blanks having varying cross-sectional portions as described; and (4) then severing the blanks. Defendant's article and process (see Exhibits 39, 40) corresponds to claims 8 and 10, respectively, and are infringements thereof.

Patent 1,600,782 is infringed by defendant company, since the proofs show that it practices the method of claim 2 and produces the article described in claim 11. Its die rolls are designed to obtain alteration in the extrusion effect emanating from the varying cross-sectional dimensions; such effect compensating for the difference

between certain portions of the matrix roll and portions preceding such portions in the rolling operation. Claims 5, 6, and 7 are particularly restricted to rolling front axle blanks or generally symmetrically shaped articles, and specify the manner in which the rolls are designed for securing compensation in rolling due to the different lengths in preceding parts. Defendant's attack of indefiniteness of claims of the patent is not sustainable for the variations in designing the rolls as to grooving, lengths, compensation of one portion to secure an effect on the preceding portion, or resulting in increasing or decreasing extrusion are sufficiently indicated in the specification and drawings, and more definite wording for the information of the skilled in the art was not required. Goodwin Film v. Eastman Kodak Co. (C. C. A.) 213 F. at page 237. That defendant cuts its matrix groove of various sizes to obtain the required compensation effect is not disputed; indeed, defendant's witness Trinks in effect testified that accurate dimensions as to groove portions and portions in the rolled article were obtained in substantially the same manner as described in the patent and claims, and accordingly there was infringement of the so-called antero-posterior patent.

It is proven that defendant polishes its die rolls in such a way as to affect the length of the article; that is, bringing the blanks back to their original lengths. Its use of a hand grinder having a portable motor with flexible shaft, and shutting down the mill so as to enable guiding the polishing tool over the rough parts of the matrix are infringements of the example claims of patent 1,607,498. No prior art, showing blunting of the corners of the rolled article to produce a fillet between the overfill or flash and the article, having been produced, defendant is shown by the evidence to have infringed the typical claim of patent 1,607,445. Indeed, defendant admits rounding or filleting the corners. Defendant redresses its worn and roughened rolls by grinding the outside surfaces, and, as admitted by plaintiff's interrogatory No. 6, "restores the matrix portions of the rolls to their original dimensions as nearly as can be accomplished"; while the length of the article formed by the redressed rolls is substantially the same length as those produced by new rolls. Prof. Trinks seemed to think that redressing the rolls imparted an increased extrusion effect, and that the article from redressed rolls was not quite as long, but I think his estimate is overcome by the witness Odwalt, a workman for a time at defendant's plant, who substantially testified that in redressing the rolls the matrix portion for the long taper was shorter than the original length in defendant's method. Defendant also used a die roll which has the grooved portions connected by a gating, as specified in claim 6, and, since that claim is limited by the disclaimer in evidence to the production of flash, and defendant rolls its blanks with flash, both claims 3 and 6 of patent 1,597,-955 are infringed by defendant in its operations and article.

The fly-cutting patent No. 1,609,045, of which claim 1 is typical of the others, is also infringed by defendant which adapts fly-cutting means, and, though defendant in making its rolls raises and lowers the axis of the tool, while Witherow varies the distance by raising and lowering the axis of the roll, yet defendant's method, since it achieves the same result, does not escape infringement. Defendant in its fly-cutting operations also makes allowance for the spring of the roll, and, as a result, its die rolls are not essentially different from Witherow's.

It is deemed unnecessary to pass upon all the claims in issue, and I have confined myself, in the main, to passing upon such claims as were regarded at the hearing as examples or typical of the particular inventions. Since the various patents, which are deemed herein to be valid, pertain to a new and useful method of die rolling metallic articles, producing them in a new form and attaining a new and distinctive result, as distinguished from existing old methods and old articles, a construction broad enough must be accorded them to afford protection for the various innovations and from any substituted equivalents of the various steps or elements set forth in the claims. Substantially the same process and steps are used by defendant that are described in the various patents. The deviations are equivalents, and any changes or modifications, if any, which tend to a betterment of the separate processes or which might ordinarily be regarded as improvements, are not subject-matter for present consideration.

There are 75 claims involved in the ten patents in controversy, and 58 in the patents held valid. Some, true enough, are divided into groups and relate to separate features, but it is unnecessary to more fully dwell upon the claims or point out similarities of details, save to show in a general

way that defendant's methods and adaptations are substantially similar to details of claims not specifically emphasized.

In a recent case [Electrical Engineers' Equipment Co. v. Champion Switch, 23 F. (2d) at page 604], Judge Learned Hand, writing for the Circuit Court of Appeals, Second Circuit, in speaking of unnecessarily incumbering the case with claims, strongly disapproved of the practice, and ruled that in general it suffices to pass upon the most important claims and those covering the alleged infringements, as they alone, he said, were necessary to a decision. In compliance with this principle, I rule that the decree to be entered herein should provide for the validity of the separate patents held valid herein, together with their infringement by defendant in its production of front and rear axle blanks and shafts of the example and article claims stressed in argument only. This, I conceive, affords plaintiffs full protection for the Witherow discovery and improvements.

### Unfair Trade, etc.

It is now necessary to consider the preliminary questions arising from the unfair competition or unfair trade issue; defendant contending, inter alia, that the causes of action are improperly joined. Plaintiffs ask not only for injunction against infringements of the various patents in suit, but also against false representations of one kind or another by which defendant is claimed to have lured away plaintiff's customers, and hiring away employees to obtain trade secrets or to ascertain from them the particular manner of its rolling operations and sales prices of products. Whether these asserted wrongful acts come within the nomenclature of unfair competition or unfair trade is not a matter of importance. These terms are treated interchangeably. Both relate to interference with the business of another by wrongful acts, including gleaning trade secrets by subterfuge by which the good will of a business is appropriated or an unfair advantage gained. The evidence ordinarily is different in unfair competition from what it is in patent litigation or in technical unfair dealing in trade, since in the former there must be a confusion of goods, a palming off of articles on an unsuspecting buyer or user, as the articles of another; while in the latter the character of the evidence is not restricted to confusion of goods, but more broadly concerns wrongful acts, relating to unfair business methods, by which a plaintiff sustains pecuniary injury and loss.

It is settled law that, where the litigation is between citizens of different states, the joining of an unfair competition cause of action with one of infringement of a patent is not prohibited, for by Equity Rule 26 it is provided "that plaintiff may join in one bill as many causes of action, cognizable in equity, as he may have against the defendant," unless such actions cannot be conveniently disposed of together—a condition not present here. The asserted unfair competition grew out of the asserted acts of infringement, and both causes of action are intimately related and connected. Hopkins' Fed. Eq. Rules, p. 168, and cases cited. See, also, Vose v. Roebuck Weather Strip Co. (D. C.) 210 F. 687. Defendant's contention, therefore, that inconsistent causes of action were improperly joined is not maintainable.

In view of the fact that at such time the original Witherow patent and one other had been granted, defendant, notwithstanding the belief of its president that any patents for die rolling automobile axle forms were invalid, was required to exercise care and circumspection in the character of the representations made to the trade with relation to the production and sale of axle blanks die rolled by it. It was not enough to inform prospective customers that its product was not the product of the Witherow Company. It is, however, true that fair allowance in business competition permits honest persuasion to induce a person to deal with another, even perhaps, to the extent of representing that his articles are as good as those of another and the sales price lower; yet, when a patent monopoly exists, the patentee or his assigns cannot lawfully be deprived of his business or of his customers or right to more fully introduce his article to the trade, by fraudulent representations or by a preconceived plan to reap the benefits to which he, as the original producer, is entitled—a production which carries with it vested property rights and which were secured by development, inventions, and a large expenditure of money. Equity unquestionably affords relief to one injured in such a situation, since fraudulent deceptions and injury to the good will of an established or prospective business, or enticement of employees to abandon their employment and enter the service of another to insure producing the same article, and thus gain an advantage in the same business by devious means and obtain the same trade in a particular industry, are acts against which redress is provided. There is plentiful legal authority for holding that such conduct is grossly inequitable,

and consequent injuries sustained either to vested or prospective property rights may be relieved. It may be conceded that there was no palming off, in the present case, by the defendant company of its goods for those of plaintiffs or their predecessor company, and that no actual confusion resulted; but the absence of this element does not, as already remarked, relieve a situation where the wrongful acts arose out of transactions involving patent infringements and are closely allied therewith. In such instances, if the patent is valid, there exists an aggravation of the infringing acts, and evidence in relation to the wrongful acts which encroach upon the trade and business of another is properly received, and must be given effect.

Plaintiff's theory, among other things, is that a scheme, plan, or contrivance to trespass on its business was evolved by the defendant company, which, through its officers and employees, in questionable way, secured admission to its plant, where automobile axles were fabricated, for the purpose of securing secret knowledge as to the manner in which its articles were produced, and thereby was enabled to die roll axle blanks in unfair competition with it. It is true that at such time all the patents in issue had not been granted, and the two that had been contained disclosures of die-rolling operations; but, as pointed out in passing upon questions of infringement, the process continued at a stage of development, as the subsequent patents indicate, and therefore there is point to Witherow's testimony that it was desired to keep persons unconnected with the business out of the plant in order to prevent its die-rolling operations from becoming known. I experience no difficulty in finding that plaintiffs' plant was operated in secret when and during the commission of the asserted wrongful acts, not as to disclosures already made public, but as to improvements, pending applications for patents, manner of operation, and refinements in production. U. S. v. Basic Products Co. (D. C.) 260 F. 472.

In the autumn of 1924, Mr. Donner, president of defendant company, inquired of one Schleiter, an officer of the company licensed by plaintiffs' predecessor to make axle blanks, for permission to inspect the rolling operations, but inspection was refused him, and he was referred to Mr. Witherow. He then sought out Witherow, stating that he desired to sell steel to his company, and was invited to visit the plant, where the die-rolling operations were quite fully disclosed to him. No steel was sold, owing, as Mr. Donner testified, to the fact that freight rates were higher than he had anticipated. In explanation of his visit, he stated that he not only desired to sell steel to the Witherow Company, but also to suggest expansion of its plant to Buffalo, and had no other motive. I do not regard the evidence as sufficient to warrant a belief that Mr. Donner visited plaintiffs' plant to obtain information as to the process in question. He considered, however, that it was a very simple matter to die roll axles by use of the known type of forming mill, and, since his plant had on hand a large tonnage of alloy steel, he deemed it advisable to use it to put into axle forms.

There was testimony by Treharne to the effect that Cherry, a representative of defendant company, while soliciting sales of axle blanks, informed him that no patent complications were involved by reason of defendant's engagement in die rolling, and that ideas had been exchanged between plaintiff and defendant on the subject and friendly relations existed. Such testimony, however, is strongly contradicted by Cherry, who denied having discussed the subject with him or solicited him to purchase axles. I think Treharne's recollection as to his conversation with Cherry was at fault, and that he confused the various conversations had at the time. Concededly there was discussion among the officers of his company regarding the probability of the Witherow patents interfering with giving defendant an order, which, not unlikely, arose from the exaction from Donner by Dodge Bros., for whom Treharne acted, of indemnity from liability. Exhibits E–G. Although Morris, a foreman in defendant's plant, in a letter dated December 10, 1925, to one Williams, an employee of plaintiffs, suggested spreading a false rumor that the two companies were getting together; yet, as this insidious document was wholly unauthorized by defendant or any of its officers, and was without its knowledge or consent, I am unwilling to consider it as in any way corroboratory of Treharne's testimony.

Nor is it satisfactorily proven that defendant made false representations to the Salisbury Axle Company of Jamestown that its axles were fabricated and die rolled by the Witherow Company, or that plaintiff's product was of inferior quality. The deposition of McGee was relied upon to substantiate such misrepresentation to the effect that Peterson, defendant's engineer, said to him that the Witherow shaft was not as good as defendant's because it was poorly annealed, and in many instances was not annealed. Peterson denied making this statement, and denied knowing McGee. He explained that he

had discussed the condition of certain rear axles and that six (marked "D") made by defendant were defective, and that various Witherow shafts were rejected by the Chrysler Company because of indifferent annealing, which thereafter was corrected, as shown by the evidence; but I do not find that any representations were made by Peterson to any of plaintiffs' customers that plaintiffs' product was inferior to defendant's and would be unsatisfactory in operation.

Much testimony was adduced tending to show that defendant illegally hired away plaintiffs' employees, ten or twelve in number. On this subject the evidence preponderatingly shows that Morris and Du Barry were engaged by defendant, the former as superintendent on March 1, 1925, eleven months after quitting the employment of the Witherow Company, and the latter, who was chief engineer of plaintiff, on May 24, 1925 (two patents only had been allowed at this time), and both had authority to employ other workmen for defendant in their respective departments. Eight men were hired by them who were actually in the employ of the Witherow Company, and three former employees. All were familiar with axle die-rolling operations. Plaintiffs claim that these employees of the predecessor company were induced to leave by increasing their compensation for similar positions with defendant with the intention of obtaining confidential information relating to plaintiffs' business, and to its damage. These men consisted of a roll designer and several experienced rollmakers, a foreman of plaintiffs' shearing and trimming department, and assistants, who were engaged at large salaries, to enter the service of defendant in the formative period of its axle die-rolling operations. Du Barry admitted that defendant's vice president engaged him at a salary of $500 per month, though receiving from plaintiff but $250. Morris also offered positions to other employees of plaintiffs, rollers and designers, at an increased wage. Langston, plaintiffs' sales manager, was approached for a similar purpose. Odwalt was hired by one Klein while still with plaintiff. Two others, Riley and Madison, were also hired by Klein, but were instructed by him to temporarily remain with Witherow and obtain such information as they could regarding rolling operations. It appears that, when Riley left Witherow and entered the employ of defendant company, he brought with him, at Klein's request, drawings and sketches of trimmer dies or shears, which were used for making trimmer dies at defendant's plant;

while Odwalt had also, upon request, before leaving Witherow, supplied Klein with a sketch of a trimmer die or shear for cutting the flash off rear axle forms, together with a shear blade holder—a special development of a stiffener device—which were subsequently used at the Donner plant. Du Barry admitted taking with him, on leaving, certain charts containing designs of rolls for axles, and a notebook containing data of experimental rollings, useful in designing die rolls. It is difficult to avoid the conclusion that the employments by Morris, Du Barry, and Klein were without the sanction and authority of defendant company or that the charts were worthless, or that defendant designed its rolls differently. It is perfectly apparent that at such time it was Morris' intention to ascertain and simulate plaintiff's method of operation and production. This is further emphasized in letters written by him to Williams, seeking information and details of operation pertaining to the annealing furnaces, the location of burners, and dimensions of furnaces. It is true Morris testified that in seeking the information, he acted on his own initiative, and Mr. Donner avers that he had no knowledge thereof, but, even so, this does not exonerate defendant. It was the beneficiary of these wrongful transactions. The shop methods constituted a trade secret, and there is analogy to the adjudications holding that books or lists of customers are confidential and constitute property rights, and that injunctive relief against making use of such lists or information without the knowledge or sanction of the owner is warranted. Morrison v. Woodbury, 105 Kan. 617, 185 P. 736, 737; U. S. v. Basic Products Co. (D. C.) 260 F. 472; Macbeth-Evans Co. v. Schnelbach, 239 Pa. 76, 86 A. 688; and see 14 R. C. L. 403.

The details of how a particular thing was done were not, in my opinion, an extension of the patent monopoly. The rights secured by reason of defendant's infringements of plaintiffs' patents are not believed inconsistent with rights springing from unfair trade, and injunctive relief from continuance of such injurious practices is not uncommon. Although none of the former employees of Witherow were under contract, and were at liberty to discontinue their connection when they pleased and enter defendant's employ at a larger salary or wage, yet, having employed them, defendant did not have the right to exact information from them relating to trade secrets or nonpatented details of operation with which they had become familiar. Du Barry admitted taking charts and a

notebook containing information of early rolling and subsequent developments and improvements, to enable him to design die rolls for defendant. The charts are said to have been useless, since defendant rolled its axles differently, but, since they were kept during his employment, and were removed without the knowledge or sanction of the Witherow Company, he had no right to take them to aid in his new employment.

In Andrews Co., Inc., v. Friedman et al., 26 Pa. Dist. R. 843, a similar situation arose, and the court said:

"While an employee has an undoubted right, if he can do so without the violation of a contractual undertaking with his employer, to withdraw from the employment and to enter into similar business on his own account, this natural, as well as legal, right does not entitle such withdrawing employee, without the knowledge, consent and approval of his employer, to take with him for his subsequent personal use and profit any property or property right of his employer during the time of his employment. In such a case there is an implied contract arising from the confidential employment that the employee shall not use, except for the purpose of service, the opportunities which that service gives him of obtaining information."

See, also, 32 C. J. §§ 158–160; Macbeth-Evans Co. v. Schnelbach, supra; High on Injunctions (4th Ed.) § 19, col. 1.

The employment of Klein by Morris and the sketch in Klein's possession of the trimmer die, and Klein's later employment of Riley, Madison, and Odwalt at increased wages, and the information sought by him from those men, likewise must be condemned for reasons already stated.

The first bill also alleges that defendant had bribed plaintiff's bookkeeper, Oberlin, for the purpose of securing confidential information as to plaintiff's business. It is unnecessary to narrate the specific details of this unsavory transaction. It is shown that various sums of money were paid him by Huston, who was vice president of the Donner Steel Company, by his personal checks and cash aggregating $1,666.67, to induce disclosure of Witherow Company prices and costs. Oberlin, before his employment by Huston, told the price at which rear axles were sold by plaintiff to the Dodge Company, but balked at giving prices to other purchasers because he considered it unfair to do so while still in the employ of the Witherow Company. He substantially testified that he was willing to impart the desired information after his employment by defendant. He resigned his position as bookkeeper and for about four months considered himself in defendant's employ as a clerk at a monthly salary based on $5,000 per annum, but no actual work was performed by him. It is not shown that Mr. Donner participated in this seamy-sided affair, or knew of the manner in which the Dodge prices, or any prices, were obtained. He was abroad when the deal was consummated, and before his return Huston severed his connection with defendant, though still continuing as a director. He was repaid by defendant company the amount he had paid Oberlin for his information, relating to his assistance in "telling the company where the costs were high in the forming mill" (see Defendant's Exhibit I), but Mr. Donner, on his return, dispensed with Oberlin's services. Other attempts to find out prices had previously been made by Morris in his efforts to employ Liebinger of the Witherow sales department. Inasmuch as Huston also had authority to hire workmen for defendant, Mr. Donner's ignorance with relation thereto, and the explanation that the Dodge order for axles had been obtained prior to Oberlin's employment, does not excuse defendant. In reaching this conclusion, the judgment recovered by Witherow Steel Company against Oberlin, enjoining him from disclosing secret operations and prices, tentatively received in evidence over defendant's objection, has been ignored, and the evidence stricken out.

There was also evidence of sales at lower prices than plaintiff's sales price, together with unfair duplication of rear axles rolled by the Witherow Company, including certain unpatented modifications in design and forms, which resulted in confusion of articles sold by plaintiffs and defendant to the same customers. My conclusion is that defendant, in copying plaintiffs' axle forms, in hiring its employees, in obtaining sales prices and costs of production, and in selling at lower prices, doubtless intended getting trade from the same persons or firms with which plaintiff was dealing. Defendant corporation, therefore, must be deemed to have competed unfairly with plaintiffs, or their predecessor company, and against the continuance of such treatment injunctive relief is afforded.

Defendant contends, in the main, that the proofs do not present a case of unfair trade or competition; that since the drawings showing proportions and shape of the axles were furnished by the automobile manufacturers, and as there was no palming off of its axles for plaintiffs', there can be no recovery. But, as heretofore stated, cases of this char-

acter are not limited to representing one's goods for those of another. Rushmore v. Manhattan Screw & Stamping Co. (C. C. A.) 163 F. 942, 19 L. R. A. (N. S.) 269, and Rushmore v. Badger Brass Mfg. (C. C. A.) 198 F. 380. Whether defendant should be relieved from an accounting need not now be decided.

In conclusion, I regret not having been able to shorten this opinion, but a series of patents relating to a technical subject, the lengthy record, the many prior art citations and asserted prior uses, the opposing views in a litigation of the utmost importance to the parties concerned affecting their industrial enterprises, the zeal manifested by able counsel on both sides, together with motions for reopening, have spurred me on to elaborate, perhaps at too great length, the various points and contentions. A short summary of the facts and conclusions, however, did not seem to me adequate.

I have not intended to give the impression that the conclusions, as to validity of the patents, were reached wholly free from doubt, but merely that the presumption of validity arising from their grant has not been overcome, and, in such case, any existing doubt must be resolved in favor of the patentees.

On Motion to Reopen Case.

A draft of the foregoing opinion had been prepared when the motion to reopen the case for additional testimony was made. ▪▪▪ Defendant urges, in the main, that flash or overfill has no important bearing on length control of the die-rolled shafts, that the patents make no reference thereto, and, further, that flash was provided simply to remove roll-spring to produce proper thickness of the article. I am not in accord with this limitation or construction. The drawings, specifications, and claims of the original patent indicate die rolling a variety of articles, notably rolling metal parts to finished dimensions or from center to center with a series of blanks connected at their ends. The term "center to center" is defined in the description, and the skilled artisan is sufficiently informed that the gatings aid in preventing slipping of blanks between the rolls, and that the blanks are rolled with flash of varying width which aids in controlling lengths. The example claims in issue refer to forming accurately spaced portions along the string, and allowing excess metal to flow sidewise in an unrestrained way to form flash integral with the blanks. While there is no direct statement that in using flash the length of the axle blank is controlled and tolerances maintained, yet its use created the effect. The description in an example points out the advantages of using flash to enable accurate rolling. It also states that, according to one form of the invention, "a definitely located flash is provided, adapted to be sheared away"; and Fig. 1 of the drawing of the first patent shows flash on a front axle blank, the description stating: "It will be noted that the blanks, as they come from the rolls, are provided with flash 7, the width of which varies generally in accordance with the reduction and deforming produced by the die rolls on the leader." Was it required that the patent should particularize the function of flash or its effect? Certainly at the hearing the use of flash on the rolled blank as a length-controlling purpose was treated as of the essence of the invention. It was evidenced that complete success was not achieved until the patentee realized the necessity of rolling with flash to insure accurate results, to wit, rolling from center to center, length control, and uniformity. Variability in length was the trouble with early efforts. There was, however, abundant persuasive testimony bearing upon the effect of the use of flash, especially as to rear axle shafts wherein the greater reduction of metal between parts of its length occurs. Assuming that the patentee did not, during the experimental stage or afterwards, realize the full extent of the functional effect, he is not estopped from claiming the result of his adaptation, for a patentee is entitled to all the benefits and uses to which an element in combination can be put. Roberts v. Ryer, 91 U. S. 150, 23 L. Ed. 267. Moreover, as I tried to make clear in the opinion treating of the primary patent, a proper construction of the claims, in view of the drawings and specifications referring to the combination elements of a rudimentary leader, center to center lengths of intermediate portions, and flash, implies accuracy and a degree of length control.

Defendant now desires to give additional evidence that flash or overfill is without a length-controlling function, and has presented Exhibit A, wherein a Chevrolet rear axle shaft was die rolled with flash, and on the same bar extension a round and square blank without flash to be used for comparison. It wishes to demonstrate by factory tests that flash on a simple article has no influence whatever on length control of the unit or string, and also that blanks without flash are more uniform in length and between dimensions. Since the section is a form of wagon axle without cross-sectional variations or in-

termediate reductions, it can scarcely be regarded as a medium of comparison. It does not present the problem confronting Witherow in varying the speed of the rolls. In rolling the wagon axle form, reduction and varying leader speed were not required, and the so-called hitching movement, a factor with which Witherow had to deal in order to attain proper length within tolerances, was lacking. The concrete bar exhibits marked "C" and "D," one with flash and the other without, rolled alternately, also, in my opinion, lacked the heavy reduction at intermediate portions required in Witherow's operation. The cross section of these bars is nearly uniform, which made it unnecessary to roll with varying speed, and consequently the difficulty of avoiding roll skidding was not present. Nor am I convinced, as to the expediency of taking additional testimony, by the tabulated blueprints as to the Dodge shaft which was rolled in strings from three different sized leader bars (see Exhibit F), that rolling rear axle forms with flash did not aid in length control. The exhibit was rolled with the same roll adjustment, but the use of several large leader bars lends force to plaintiffs' suggestion that they were unsuited for the pass of the rolls in operation, and that the steps of the process were not used. There is much discussion regarding the significance of the test, but, in view of my lengthy opinion herein, further elaboration is not believed necessary. In general, developments in a new art by experimental tests following an action for infringement, showing other means for accomplishing the result, are accorded slight weight, especially when they have doubtful bearing upon the main issue.

The motion of defendant to reopen the case for taking further testimony is denied, and a decree may be entered in conformity with the opinion, with costs to plaintiffs as to the patents held valid, and proportional costs to defendant as to patents held invalid.